# United States Tax Court

T.C. Memo. 2024-58

MARK G. STROM,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

BERNEE D. STROM,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 16258-08, 16711-08.            Filed May 16, 2024.

————

*John M. Colvin*, *Darrell D. Hallett*, *Cory L. Johnson*, and *Jason A. Harn*, for petitioner in Docket No. 16258-08.

*John M. Colvin*, *Darrell D. Hallett*, *Cory L. Johnson*, *Cori E. Flanders-Palmer*, and *Jason A. Harn*, for petitioner in Docket No. 16711-08.

*Kaelyn J. Romey*, *Bryant W. Smith*, *Timothy A. Froehle*, *Gregory Michael Hahn*, *Alicia H. Eyler*, *Amy Chang*, and Michael Finstad (student), for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: These cases have been consolidated for purposes of trial, briefing, and opinion. Petitioner Mark G. Strom[1] and his spouse,

_____

[1] *See* Docket No. 16258-08.

[*2] petitioner Bernee D. Strom[2] (collectively, Stroms), filed a joint federal income tax return for the taxable year 2000. Respondent thereafter determined a deficiency of $39,812,187 in the Stroms' federal income tax for that year.[3] The deficiency arises from an unreported income adjustment of $100,535,826, representing the portion of wages reported on Forms W–2, Wage and Tax Statement, issued to Mrs. Strom by InfoSpace.com, Inc. (InfoSpace), for 2000 but not reported as income on the Stroms' 2000 return.

Dr. and Mrs. Strom each timely petitioned the Court for redetermination, alleging respondent's deficiency determination was erroneous. Dr. Strom's Petition in addition alleged that he was entitled to relief under section 6015[4] with respect to any deficiency sustained. Dr. and Mrs. Strom each subsequently entered into an agreement with respondent in which they conceded all allegations of error with respect to the unreported income adjustment and deficiency; additionally, they have conceded that the amounts of the unreported income adjustment and the deficiency determined in the notice of deficiency (i.e., $100,535,826 and $39,812,187, respectively) are correct.[5] Consequently, the only issue remaining for decision is whether Dr. Strom is entitled to relief under section 6015(b) or (f) from the joint and several liability due

---

[2] *See* Docket No. 16711-08.

[3] Following the commencement of these proceedings, the parties filed Joint Motions for Continuance, representing therein that the resolution of the issues raised by a suit brought by the Stroms in the U.S. District Court for the Western District of Washington, seeking the refund of federal income and Medicare taxes paid in 1999 and Medicare tax paid in 2000, could prove dispositive in these cases. A stay was granted pending resolution of the government's appeal of the District Court's decision to the U.S. Court of Appeals for the Ninth Circuit. *See Strom v. United States*, 641 F.3d 1051, 1055 n.4 (9th Cir. 2011), *rev'g and remanding* 583 F. Supp. 2d 1264 (W.D. Wash. 2008). Following the issuance of the Ninth Circuit's opinion, the parties in each case filed a Stipulation of Settled Issues wherein the Stroms conceded all issues in these cases except whether Dr. Strom is entitled to relief under section 6015(b) or (f) for 2000. That issue was subsequently tried during a four-day special trial session.

[4] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts have been rounded to the nearest dollar.

[5] Dr. Strom has also conceded that, despite his assertion to the contrary in the Petition, the notice of deficiency was timely issued to him.

[*3] with respect to the Stroms' taxable year 2000.[6] For the reasons that follow, we hold that he is not.

FINDINGS OF FACT

Some of the facts have been stipulated and, together with the Exhibits attached thereto, are incorporated herein by this reference. When the Petitions were filed in these cases, the Stroms resided in the State of Washington.

I.  *Background*

Dr. and Mrs. Strom were married in 1967. At all relevant times, they have remained married to and resided with each other.

A.  *Dr. Strom's Education and Professional Experience*

Dr. Strom has B.S., M.D., and M.B.A. degrees. He has seven years of postgraduate training, including a surgical internship, a general surgery residency, and a fellowship in cardiothoracic surgery. From 1973 to 1976 he served as a clinical instructor in surgery at the Albert Einstein College of Medicine and, from 1979 until at least 2003, as an associate in surgery in the Department of Cardiothoracic Surgery at the University of California, Los Angeles (UCLA) School of Medicine. From 1976 to 1992, Dr. Strom served as chief of cardiac and thoracic surgery at Garfield Medical Center in Los Angeles, California, and from 1976 to 1993, as president of Cardiothoracic Associates of Los Angeles, Inc., a large clinical practice.

From 1983 to 1985, while maintaining his practice as a cardiac and thoracic surgeon, Dr. Strom pursued his M.B.A. degree at UCLA attending classes at nights and on weekends. As part of his M.B.A. curriculum, Dr. Strom took at least one finance course and one accounting course. He earned his M.B.A. from UCLA in 1985.

From 1993 to 1995 Dr. Strom continued his practice as a cardiac and thoracic surgeon with a moderately sized surgical group in Des Moines, Iowa. In 1995 Dr. Strom retired from his surgical practice to pursue other professional opportunities.

---

[6] Dr. Strom is ineligible for relief under section 6015(c) because at all relevant times he has been married to and resided with Mrs. Strom.

**[\*4]**  Following his retirement as a cardiac and thoracic surgeon, Dr. Strom pursued a career as a healthcare consultant and executive. From 1996 to 1997 Dr. Strom served as a consultant in the Healthcare Industry Group at Perot Systems Corp. in Dallas, Texas, where he specialized in the clinical and operational management of healthcare delivery systems, assisting clients in implementing managed care. From 1997 to 1999 Dr. Strom served as vice president of medical affairs and chief medical officer for Salus Media, Inc., in Santa Barbara, California, an internet application for large corporations and managed care organizations.  From 1999 to 2000 Dr. Strom served as president and chief executive officer of Asterion.com (Asterion) in Redmond, Washington, a medical claims processing company.  During 2000 Dr. Strom worked full time and was in the Asterion office daily.  Dr. Strom resigned as a member of the board of directors of Asterion and as its president and chief executive officer in September 2000.

After leaving Asterion, Dr. Strom spent time training in medical acupuncture at UCLA, completing the training in 2003.  Since that time Dr. Strom has practiced medical acupuncture and psychosomatic medicine in Seattle, Washington.  In 2005 his left thumb was amputated, leaving him unable to perform surgical procedures.

During his career, Dr. Strom has been licensed as a physician in New York (1970), California (1972), Iowa (1993), Pennsylvania (1993), Missouri (1995), and the State of Washington (1999).  He has published several articles during his career, including three articles in 2000.

At the time of trial, Dr. Strom was 69 years old and still licensed as a physician in five states.  At that time he was also writing a book about healthcare in the United States.

B.    *Mrs. Strom's Education and Professional Experience*

Mrs. Strom holds B.S. and M.A. degrees in mathematics and an M.B.A. degree, which was conferred on her by UCLA in 1980.  After obtaining her M.B.A., she worked as a management consultant and a director of circulation at the Los Angeles Herald Examiner newspaper, and then founded and was a principal at Gemstar Development Corp., which created a programming code for VCRs and invented the electronic program guide now widely used in televisions for program selection. With a partner, she then formed a company that developed code for synchronizing electronic devices.  She was then recruited to be chief executive officer of a company that was a consortium of Westinghouse,

[*5] CBS, and Gannett Co., Inc., created to develop high-definition radio. After that, she was recruited to become chief executive officer of Priceline.com, an online travel agency for finding discount rates for travel-related purchases such as airline tickets and hotel stays. In November 1998 Mrs. Strom was hired by InfoSpace as its president and chief operating officer. Her employment with the company began in November 1998, shortly before its initial public offering. She also served on the company's board of directors.

On January 1, 2000, Mrs. Strom resigned as president and chief operating officer of InfoSpace and became president of InfoSpace's newly formed venture capital division, InfoSpace Venture Capital Fund. She also resigned from the InfoSpace board of directors effective March 31, 2000. After June 30, 2000, Mrs. Strom was no longer employed by InfoSpace in any capacity.

At the time of trial, Mrs. Strom was earning $240,000 per year as chairman of the board of directors and chief executive officer of Web Tuner, a startup company which at the time was developing a platform for delivering television programming over the internet via broadband signal. She was compensated with common stock of the company. In addition she was serving on the board of directors for Benchmark Electronics, a contract manufacturer of computer equipment and medical devices. She was also serving on the board of trustees of the National Public Radio Foundation and has received numerous awards and recognitions during her career, including being named as one of the 100 most inspiring alumni of the Anderson School of Management at UCLA. At the time of trial Mrs. Strom was 67 years old.

C.    *The Kirkland Condominium*

In 1998 the Stroms moved to Seattle, Washington. In June 1999 they purchased a condominium in nearby Kirkland, Washington, for $3,645,000, and incurred $500,000 for renovations shortly thereafter (Kirkland condominium). The Stroms financed $1.5 million of the purchase price.

After completing renovations on the Kirkland condominium, the Stroms moved into it around May 2000. From that time to the time of trial, Dr. and Mrs. Strom continued to reside together in the Kirkland condominium.

[*6]  D.  *The Stroms' Handling of Their Day-to-Day Household Finances*

During the relevant period, Dr. Strom participated in various aspects of managing the Stroms' day-to-day household finances, including drafting checks on joint accounts, determining whether to pay bills, and communicating on the Stroms' behalf with financial advisers and institutions.  Although Mrs. Strom primarily handled financial matters for the household, an arrangement that Dr. Strom preferred, he was nevertheless involved in, and capable of handling, such matters when she was away traveling.  If an issue arose when Mrs. Strom was traveling, Dr. Strom would contact her when he was unsure how to proceed.  During the relevant period, the Stroms communicated constantly about household financial matters, such as bills, and their personal assistant in Kirkland, Cynthia Donaldson,[7] treated Dr. Strom as being equally in charge with respect to such matters.

During the relevant period, a bank account at Bank of America ending in 8864 was jointly controlled by Dr. and Mrs. Strom in their individual capacities (Strom 8864 Account).  During the relevant period, Dr. Strom had full access to, and signatory authority over the funds held in, the Strom 8864 Account.  Throughout 2000, Dr. Strom prepared and signed checks drawn on the Strom 8864 Account.  These checks involved the payment of the Stroms' bills, and the amounts ranged from tens, to tens of thousands, of dollars.

During the relevant period, a bank account at Wells Fargo ending in 4870 was jointly controlled by Dr. and Mrs. Strom in the name of the Strom Family Trust of 1982 (Strom Family Trust 4870 Account).  Dr. Strom had full access to, and signatory authority over the funds held in, the Strom Family Trust 4870 Account.  Throughout 2001, Dr. Strom prepared and signed checks drawn on the Strom Family Trust 4870 Account.  These checks involved the payment of the Stroms' bills, and the amounts ranged from tens, to tens of thousands, of dollars.

During the relevant period, Mrs. Strom did not in any way restrict Dr. Strom's access to the Stroms' financial records.  The Stroms were fastidious recordkeepers and shared a home office in the Kirkland condominium where paper copies of their business and financial records were kept.  Dr. Strom had full access to these records.  To the extent

---

[7] From May 20, 2000, until approximately May 2008, Ms. Donaldson worked 40 hours per week for the Stroms as a personal assistant.

[*7] records were electronically stored in Quicken, Mrs. Strom would have shown Dr. Strom the books and records stored therein if he had asked to see them.

### E.  *The Stroms' History of Joint Tax Filing*

The Stroms filed joint Forms 1040, U.S. Individual Income Tax Return, for the taxable years 1967 through 2012. During those years the Stroms relied on professional tax advisers to prepare and file their returns. For the preparation and filing of their 2000 return, the Stroms engaged a team of such advisers.

As a matter of course during each year of their marriage, Dr. Strom provided any relevant tax documents to Mrs. Strom for inclusion in the preparation of their joint return. This included any Forms W–2 that he received. Dr. Strom understood at all relevant times that issuance of a Form W–2 indicates that the form's recipient has received income.

## II.  *Exercise of InfoSpace Stock Options*

### A.  *InfoSpace Stock Option Agreements*

When Mrs. Strom was hired by InfoSpace in November 1998, she was granted incentive stock options and nonstatutory stock options pursuant to three stock option agreements. These agreements provided Mrs. Strom with conditional rights to purchase a designated number of shares of InfoSpace at a specified price. Her ability to exercise the stock options was tied to a vesting schedule.

A "Consent of Spouse" form was attached to each of the three stock option agreements. Among other things, the Consent of Spouse form stated that the consenting spouse had read and understood the agreement in question and that, in consideration of granting his spouse the right to purchase shares of InfoSpace, the consenting spouse was appointing his spouse as his attorney-in-fact with respect to the exercise of any rights conferred by the agreement (insofar as he may have had any such rights under the community property laws of the State of Washington). After reading at least one of the three agreements, Dr. Strom signed the Consent of Spouse form attached to each agreement.[8]

---

[8] Only two of the three stock option agreements in the record have been signed by Dr. and Mrs. Strom. The remaining agreement has been signed only by Naveen

[*8] Although Dr. Strom did not ask Mrs. Strom for an explanation of the three agreements before signing the Consent of Spouse forms, she would have provided such an explanation if he had requested one.

B. *Exercises of InfoSpace Stock Options in 2000*

Pursuant to the stock option agreements, Mrs. Strom exercised nonstatutory stock options during 2000 with resulting gains as set forth in the table below:

| Date | # of Shares[9] | Market Value | Option Price | Total Gain |
|---|---|---|---|---|
| 1/06/2000 | 133,336 | $11,883,571.00 | $500,010.00 | $11,383,561.00 |
| 2/07/2000 | 150,000 | 23,568,750.00 | 562,500.00 | 23,006,250.00 |
| 2/09/2000 | 13,589 | 2,432,431.00 | 50,958.75 | 2,381,472.25 |
| 2/29/2000 | 150,000 | 32,550,000.00 | 562,500.00 | 31,987,500.00 |
| 5/03/2000 | 143,008 | 8,616,232.00 | 268,140.00 | 8,348,092.00 |
| 5/11/2000 | 25,000 | 1,218,750.00 | 46,875.00 | 1,171,875.00 |
| 7/11/2000 | 175,000 | 7,590,625.00 | 328,125.00 | 7,262,500.00 |
| 7/11/2000 | 486,486 | 21,101,330.25 | 912,161.25 | 20,189,169.00 |
| **Total** | **1,276,419** | **$108,961,689.25** | **$3,231,270.00** | **$105,730,419.25** |

Personal checks were issued to InfoSpace in the amounts of $3,085,332.07, $9,982,818.75, and $2,726,653.09 drawn on the Strom 8864 Account, as payment towards the option price and the taxes that needed to be withheld for the above-referenced option exercises.

Dr. Strom knew that Mrs. Strom was exercising InfoSpace stock options in 2000 and did not object because he trusted her judgment that the stock was a good investment. On that same basis Dr. Strom chose not to review all the documentation relating to the exercise of the InfoSpace stock options.

C. *Financing the Stock Option Exercises*

In order to pay the remainder of the option prices and withholding due for the above-referenced exercises of InfoSpace stock options in

---

Jain, the then chairman and chief executive officer of InfoSpace. However, at trial Mrs. Strom testified that she obtained Dr. Strom's signature on each of the Consent of Spouse forms. We accordingly find that Dr. Strom signed each.

[9] These figures account for stock splits.

[*9] 2000, Mrs. Strom borrowed $10 million from InfoSpace and the Stroms together borrowed $10 million from Bank of America.

### 1.  *$10 Million InfoSpace Loan*

A dispute later arose with respect to the $10 million InfoSpace loan. Mrs. Strom and InfoSpace ultimately settled the matter through Mrs. Strom's paying InfoSpace $3.3 million in cash and transferring to it the shares of InfoSpace stock that had been pledged as collateral for the loan.

### 2.  *$10 Million Bank of America Loan*

The Stroms together also obtained a $10 million personal loan from Bank of America[10] in 2000 to pay a portion of the option prices and withholding due for the InfoSpace stock options. By letter dated March 3, 2000, the Stroms' financial adviser provided Bank of America with a financial statement for the Stroms, listing total assets of $316,229,977.31 and total liabilities of $29,441,186, for a net worth of $286,788,791.31 as of February 29, 2000.

Pursuant to an Individual Loan Agreement dated March 10, 2000, the Stroms, as trustees of the Strom Family Trust, and Bank of America entered into an agreement whereby the latter agreed to provide the former with access to a $10 million line of credit between the date of the agreement and September 30, 2000 (BoA Loan Agreement). In connection with the BoA Loan Agreement, the Stroms each individually entered into a Continuing and Unconditional Guaranty, whereby each unconditionally guaranteed, and promised to pay promptly, any and all indebtedness of the Strom Family Trust to Bank of America. Pursuant to the BoA Loan Agreement, the Stroms were required to repay in full all principal and any unpaid interest or other charges by September 30, 2000.

The Stroms and Bank of America subsequently executed amendments to the BoA Loan Agreement, including three amendments extending the period for which the $10 million line of credit would be

---

[10] The Stroms' initial dealings with respect to this loan were with Seafirst Bank, which was thereafter acquired by Bank of America. In the interest of simplicity, we refer exclusively to Bank of America when discussing matters concerning the $10 million line of credit extended by Bank of America to the Stroms in 2000 for the purpose of exercising InfoSpace stock options, even when the materials being described refer to Seafirst Bank.

[*10] available, and the date by which the Stroms would be required to repay in full all principal and interest thereunder, to November 1, 2000, February 1, 2001, and June 28, 2003, respectively. Dr. Strom signed the BoA Loan Agreement and all amendments thereto.

The Stroms subsequently borrowed $10 million from Bank of America pursuant to the BoA Loan Agreement for the purpose of exercising InfoSpace stock options in 2000 ($10 million BoA Loan).

D. *Recommendation to Sell InfoSpace Shares*

By letter dated October 20, 2000, the Stroms' financial adviser recommended, inter alia, that the Stroms "consider selling 300,000 shares of . . . [their] highest basis shares of . . . [InfoSpace stock] between now and year end." The Stroms did not heed the advice; most of the InfoSpace shares acquired by Mrs. Strom in 2000 were retained through yearend.[11] During 2000 the value of the shares plummeted: For example, when Mrs. Strom exercised options for 300,000 shares on February 29, 2000, the market value per share was $108.50. However, by the end of the year the market value per share had dropped to $8.8438.

III. *Forms W–2 for 2000*

For 2000 InfoSpace issued Mrs. Strom four Forms W–2 reporting wage income to her of (1) $10,421,734.10, (2) $10,421,734.10, (3) $69,689,666.24, and (4) $15,993,750, resulting in total Form W–2 income of $106,526,884.44. Mrs. Strom informed Dr. Strom about the InfoSpace Forms W–2 after receiving them in January 2001. Believing that the income amounts reported on the Forms W–2 were overstated, Mrs. Strom retained counsel as described hereinafter.

Asterion issued a Form W–2 to Dr. Strom for 2000 reporting income to him of $95,438.93. He provided a copy to Mrs. Strom and to the couple's return preparer.

IV. *Development of the Reporting Positions for Income Attributable to Mrs. Strom's InfoSpace Option Exercises in 2000*

From January 30, 2001, to the filing of the Stroms' 2000 return on October 15, 2001, Dr. Strom participated alongside Mrs. Strom in discussions with a team of attorneys and tax consultants they jointly

---

[11] During 2000 Mrs. Strom sold 109,589 shares of InfoSpace.

**[\*11]** retained to gather the facts involving Mrs. Strom's InfoSpace option exercises in 2000 and to develop tax-favorable positions on the 2000 return with respect to the income attributable to those exercises. The Stroms' advisers in this process included their attorneys George T. Cowan,[12] Timothy L. Austin,[13] Bruce H. Benson,[14] Darrell D. Hallett, and John M. Colvin,[15] and the tax consultants Susan K. Swartz and Richard A. Lintermans from the national accounting firm KPMG, LLP (KPMG).[16] Karen B. Brenner, the Stroms' personal financial adviser, also participated.

During the process, the Stroms and these advisers considered a number of possibilities for reducing the Stroms' 2000 tax liability before settling on a strategy that would defer calculation and recognition of most of the income attributable to Mrs. Strom's InfoSpace option exercises in 2000, to the taxable year 2001, at a time when the market value of the InfoSpace stock was considerably lower, thereby resulting in correspondingly lower gains (and tax liabilities) on the option exercises.[17] This deferral strategy resulted in the omission of over

---

[12] The Stroms retained Mr. Cowan on or about January 30, 2001. The scope of Mr. Cowan's engagement with the Stroms also extended to representing them in connection with their negotiations over repayment of the $10 million BoA Loan.

[13] Mr. Austin, a tax lawyer, was referred to the Stroms by Mr. Cowan and thereafter retained on or about January 30, 2001.

[14] Mr. Benson, a securities lawyer, was referred to the Stroms by Mr. Cowan and retained on or about February 27, 2001.

[15] Messrs. Hallett and Colvin, both lawyers with expertise in tax controversy, were retained by the Stroms in February 2001. Messrs. Hallett and Colvin also represented the Stroms during the 2000 audit and represent them in these cases. We therefore note that the Stroms have waived any potential conflict of interest with respect to Messrs. Hallett and Colvin representing them in these cases.

[16] In February 2001 Mr. Cowan referred the Stroms to KPMG, which was thereafter engaged in two capacities: (1) by Mr. Cowan under a *Kovel* agreement, *see United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), for purposes of tax consulting, namely, to assist in gathering facts and developing tax-favorable positions with respect to income attributable to Mrs. Strom's InfoSpace option exercises in 2000; and (2) by the Stroms themselves for purposes of preparing the 2000 return.

[17] Most of the InfoSpace shares acquired by Mrs. Strom through option exercises in 2000 were retained by her and not sold during that year. The above-referenced deferral strategy applied only with respect to those retained shares. With respect to the shares that Mrs. Strom acquired in 2000 through option exercises and sold during that year, the income attributable thereto was included in gross income as compensation based on the amount realized on the date of sale.

**[*12]** $100 million in income from the 2000 return.[18] As discussed below, the nearly nine-month process of developing that strategy and crafting the positions on the 2000 return with respect to the income attributable to Mrs. Strom's InfoSpace option exercises included in-person meetings, conference calls, an opinion letter and memoranda, letters by KPMG warning about the viability of the positions, and the preparation of a disclosure statement to be attached the 2000 return. As also discussed below, Dr. Strom was aware of, participated in, or approved, each of these steps in the process.

A.    *In-Person Meetings*

At least three in-person meetings were held by the Stroms and their advisers during the period in question: on February 27,[19] March 2,[20] and June 13, 2001.[21] Dr. Strom attended each of these meetings. During these meetings the facts, circumstances, and legal issues involving Mrs. Strom's InfoSpace option exercises in 2000 were discussed, and Dr. Strom had the opportunity to ask questions regarding those matters.

After considering a number of alternatives that were deemed untenable, the Stroms and their advisers settled on a strategy that would defer, to the taxable year 2001, calculation and recognition of most of the income attributable to Mrs. Strom's InfoSpace option exercises in 2000. This deferral strategy was effected by the Stroms' adoption of two positions on the 2000 return with respect to the InfoSpace shares acquired by Mrs. Strom in 2000 but not sold during that year; namely, that (1) under section 83(c)(3)[22] calculation and

---

[18] As noted, the Stroms have conceded that the amounts of the unreported income adjustment and the deficiency respondent determined in the notice of deficiency ($100,535,826 and $39,812,187, respectively) are correct.

[19] Attendees of the meeting on February 27, 2001, included Dr. and Mrs. Strom, Mr. Austin, Mr. Benson (who may have participated by telephone), Ms. Brenner, Mr. Cowan, Mr. Hallett, and Ms. Swartz.

[20] Attendees of the meeting on March 2, 2001, included Dr. and Mrs. Strom, Mr. Austin, Mr. Benson, Mr. Colvin, Mr. Cowan, and Ms. Swartz.

[21] Attendees of the meeting on June 13, 2001, included Dr. and Mrs. Strom, Mr. Austin, Mr. Benson, Ms. Brenner, Mr. Colvin, Mr. Cowan, Mr. Hallett, Ms. Swartz, and Mr. Lintermans.

[22] Section 83(c)(3) provides that, so long as a sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934 (Exchange Act), the person's rights in the property are "subject to a substantial risk of forfeiture" and "not transferable" for purposes of section 83. "If a taxpayer is permitted

**[\*13]** recognition of the income attributable to the exercises were deferred until June 30, 2000, because a sale of the InfoSpace shares by Mrs. Strom before that time could have subjected her to a suit under section 16(b) of the Exchange Act (Section 16(b) Position);[23] and (2) under Treasury Regulation § 1.83-3(k),[24] calculation and recognition of the income attributable to the exercises were further postponed until January 29, 2001, because the InfoSpace shares in question were subject to restrictions on transfer imposed by "Pooling-of-Interests Accounting" rules[25] as applied to a merger between InfoSpace and the company Go2Net, Inc., announced on July 26, 2000 (Pooling-of-Interests Position).

Concerns at KPMG about the strength of these two positions, and the potential consequences of adopting them on the 2000 return, resulted in Messrs. Austin and Benson drafting supporting opinions for purposes of limiting penalty exposure for both KPMG (as the return preparer) and the Stroms (as the taxpayers). These opinions were set forth in a letter by Mr. Austin and three memoranda by Mr. Benson.

---

to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock." *Strom*, 641 F.3d at 1054.

[23] Under section 16(b) of the Exchange Act, a corporate insider (e.g., an owner, director, officer) is generally prohibited from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. *See* 15 U.S.C. § 78p(b); *see also Strom*, 641 F.3d at 1056 ("Section 16(b) of the Securities Exchange Act of 1934 . . . is a prophylactic rule prohibiting corporate insiders from profiting on 'short-swing' securities trades—specifically, on a purchase and a sale of their company's securities made within any period of less than six months.").

[24] Treasury Regulation § 1.83-3(k) provides: "For purposes of section 83 and the regulations thereunder, property is subject to substantial risk of forfeiture and is not transferable so long as the property is subject to a restriction on transfer to comply with the 'Pooling-of-Interests Accounting' rules set forth in Accounting Series Release Numbered 130 . . . and Accounting Series Release Numbered 135 . . . ." (The pooling-of-interests rules are discussed *infra* note 25.)

[25] As discussed more fully in the opinion of the U.S. Court of Appeals for the Ninth Circuit, "[t]he pooling-of-interests rules were a method of accounting for business mergers permitted during the tax years at issue for companies that met requirements set out in Accounting Principles Board Opinion No. 16." *Strom*, 641 F.3d at 1069. These rules "required stockholders of both companies in a merger to share the risks of the combined entities," and such "[r]isk-sharing was accomplished in part by restricting officers from trading in shares of their company during the merger process." *Id.*

[*14] The aforementioned concerns at KPMG additionally led to the preparation of a disclosure statement to be attached to the 2000 return.

During the three in-person meetings, the Stroms' advisers described and explained to both Dr. and Mrs. Strom the Section 16(b) Position and the Pooling-of-Interests Position, the levels of authority supporting them, and the alternatives thereto.

The opinion letter and memoranda that Messrs. Austin and Benson drafted in support of those positions were also explained to Dr. and Mrs. Strom, as were the potential for the Stroms' 2000 return to be selected for examination, and the advisability and benefits of attaching a disclosure statement to the 2000 return. Both Dr. and Mrs. Strom made efforts to understand, ask questions, and otherwise be engaged in these discussions.

B.    *Conference Calls*

In addition to attending the three in-person meetings, during the period in question Dr. Strom participated in at least 21 conference calls with the Stroms' advisers, including, at various points, Mr. Cowan, Mr. Austin, Mr. Benson, Ms. Swartz, and Ms. Brenner. Issues discussed during these calls included the Stroms' 2000 tax liability, the Section 16(b) Position and the Pooling-of-Interests Position, and the disclosure statement to be attached to the 2000 return. Mrs. Strom did not participate in 7 of these 21 calls.

Additionally, Dr. Strom—but not Mrs. Strom—participated in a conference call in March 2001 with various KPMG professionals and other KPMG clients regarding the possible creation of a coalition that would lobby Congress for legislative changes to the federal income tax laws as they relate to the exercise of stock options in a falling market. Following the call, Dr. Strom advised Ms. Swartz that the Stroms had decided to decline KPMG's invitation to participate in the potential coalition. Over the course of the Stroms' engagement with KPMG, Ms. Swartz never questioned Dr. Strom's authority to speak on behalf of Mrs. Strom or his capacity.

C.    *Opinion Letter and Memoranda*

As noted, during his engagement with the Stroms, Mr. Austin issued an opinion letter in support of the Section 16(b) Position and the Pooling-of-Interests Position. In his letter, which incorporated the opinions of Mr. Benson in certain memoranda on the securities law

**[*15]** issues, Mr. Austin opined that substantial authority existed for both the Section 16(b) Position and the Pooling-of-Interests Position, and that, pursuant to those positions, calculation and recognition of the income attributable to most of Mrs. Strom's InfoSpace option exercises in 2000 was deferred until at least January 29, 2001.[26] Before issuing the opinion letter, Mr. Austin was aware of the relevant reporting and disclosure standards and the level of authority necessary to insulate the Stroms from potential liability for accuracy-related penalties. Mr. Austin intended for the Stroms and KPMG to rely on his opinion letter as the return filers and return preparer, respectively.

At the in-person meeting on June 13, 2001, drafts of Mr. Austin's opinion letter and the memoranda of Mr. Benson that it incorporated were discussed and explained to Dr. and Mrs. Strom. During that meeting, Dr. Strom had the opportunity to ask Messrs. Austin and Benson questions regarding their respective opinions.

Before the completion of the final draft of Mr. Austin's opinion letter, Messrs. Austin and Hallett discussed edits that had been proposed by the latter. Mr. Austin's final draft of the opinion letter incorporated certain of Mr. Hallett's proposed edits.

> D. *Warnings From KPMG About the Viability of the Section 16(b) Position and the Pooling-of-Interests Position*

Before the 2000 return was filed, Dr. and Mrs. Strom were warned by KPMG in writing at least twice that the firm did not expect the Section 16(b) Position or the Pooling-of-Interests Position to be sustained upon audit if challenged by the Internal Revenue Service (IRS).

> 1. *Letter Dated June 8, 2001*

On June 8, 2001, Ms. Swartz emailed Dr. Strom, Mrs. Strom, Mr. Cowan, Mr. Austin, and Ms. Brenner, attaching, inter alia, a letter bearing the same date addressed to Dr. Strom, Mrs. Strom, and Mr. Cowan. In the letter, after summarizing KPMG's conclusions with

---

[26] The Stroms adopted the Section 16(b) Position and the Pooling-of-Interests Position only with respect to the InfoSpace shares that were acquired by Mrs. Strom through option exercises in 2000 but not sold during 2000. With respect to the InfoSpace shares that were acquired through option exercises in 2000 and sold during 2000, Mr. Austin's letter opined that substantial authority existed that the income attributable to such exercises would be includible in gross income as compensation based on the amount realized on the date of sale.

[*16] respect to the Section 16(b) Position and the Pooling-of-Interests Position, Ms. Swartz advised: "These two issues are intertwined, as when the Section 16(b) trading restrictions lapse June 30, 2000, they are 'tagged' with the pooling trading restrictions that begin June 26, 2000 and lapse January 29, 2001. . . . [I]n aggregate, these two positions reduce the 2000 tax liability by approximately $35 million."

However, in the letter Ms. Swartz also advised both Dr. and Mrs. Strom that KPMG had concluded that these two positions were merely "not frivolous," meaning that KPMG could sign the return as preparer only if the positions were properly disclosed:

> "Not frivolous" is a minimum standard for taking a position on a tax return. It does not reflect an expectation of success if the positions are challenged. Because of the magnitude of the income and tax involved, and because the positions are inconsistent with the reporting by Infospace on Bernee's Form W–2, we believe the 2000 tax return will be audited by the Internal Revenue Service. Upon audit, we would expect these issues to be challenged. While there are many factors that can impact the outcome of an audit, you should be prepared for a protracted process that will require resources and ultimately could put you in a less favorable position than had the positions not been claimed (other than from the standpoint of the timing of the tax payments).

### 2. *Letter Dated October 12, 2001*

Several of Ms. Swartz's colleagues at KPMG subsequently reviewed her June 8 letter and advised that (1) in order for the Stroms to avoid a section 6662 accuracy-related penalty, even with disclosure of the challenged positions, the positions must be found to have had a "reasonable basis" and (2) they believed the positions had a reasonable basis.

Thereafter, in a revised letter to both Dr. and Mrs. Strom dated October 12, 2001, Ms. Swartz summarized KPMG's "final conclusions" with respect to the Section 16(b) Position and the Pooling-of-Interests Position. In that letter Ms. Swartz again advised that the positions were intertwined and that, when combined, they deferred calculation and recognition of most of the income attributable to Mrs. Strom's option

**[\*17]** exercises in 2000 until January 29, 2001, thereby reducing the Stroms' 2000 tax liability by approximately $35 million.

However, Ms. Swartz also advised both Dr. and Mrs. Strom that KPMG had concluded that there was only a "reasonable basis" for the Section 16(b) Position and the Pooling-of-Interests Position, and that "to protect against imposition of the 20% understatement penalty, the position[s] must be adequately disclosed in the tax return on Form 8275, Disclosure Statement." Ms. Swartz further advised:

> "Reasonable basis" is not a standard that reflects an expectation of success if the positions are challenged. Because of the magnitude of the income and tax involved, and because the positions are inconsistent with the reporting by Infospace on Bernee's Form W–2, we believe the 2000 tax return will be audited by the Internal Revenue Service. Upon audit, we would expect these issues to be challenged. While there are many factors that can impact the outcome of an audit, you should be prepared for a protracted process that will require resources and ultimately could put you in a less favorable position than had the positions not been claimed (other than from the standpoint of the timing of the tax payments).

Dr. Strom reviewed at least one of these two letters.

### E. *Disclosure Statement*

At the in-person meeting on June 13, 2001, the Stroms and their advisers discussed the advisability of attaching a disclosure statement to the 2000 return, as well as suggested content for any such statement. This discussion extended to how a disclosure statement might positively affect an initial IRS review of the 2000 return (and thus decrease the chances of an audit) by possibly (1) providing answers to the likely questions that IRS personnel would have in view of the inconsistency between the amount of income reported on the InfoSpace Forms W–2 and the amount reported on the Stroms' return and (2) persuading IRS personnel that the Stroms' positions with respect to the income attributable to Mrs. Strom's InfoSpace option exercises were well founded and supported by relevant legal authority. The discussion concluded with a consensus among the Stroms' advisers that the Stroms would be well advised to attach a disclosure statement to the 2000 return.

**[\*18]** Over the next two months the Stroms' team of advisers worked on a disclosure statement (Disclosure Statement). The Disclosure Statement in substantial part reflected the input of Messrs. Hallett and Colvin. It discussed Mrs. Strom's officer status at InfoSpace and the claimed error in InfoSpace's reported income on the Forms W–2 issued to her due to the failure to account for the purported restrictions arising from section 83(c)(3) on the transfer of the InfoSpace stock she acquired pursuant to stock options during 2000 and the purported substantial risk of forfeiture of the stock during 2000 under Treasury Regulation § 1.83-3(k). The Disclosure Statement further opined that the foregoing transfer restrictions and forfeiture risk caused a deferral of the recognition of any income resulting from Mrs. Strom's exercise of her stock options in 2000 to taxable year 2001, when the transfer restrictions and forfeiture risks ended.

Mr. Cowan emailed a draft of the Disclosure Statement (which substantially reflected the final version) to both Dr. and Mrs. Strom on August 9, 2001, observing in the email: "Hopefully it [the Disclosure Statement] will prove to be the marketing piece we seek." The next day, Mr. Cowan discussed the Disclosure Statement by telephone with Dr. Strom, Mrs. Strom, Mr. Hallett, and Ms. Swartz, and circulated to them a version, with minor revisions based on the call, that day.

On August 13, 2001, Dr. Strom responded to Mr. Cowan's email, approving the Disclosure Statement and instructing Ms. Swartz as to the filing of an extension for the Stroms' 2000 return:

> This looks good as per Bernee [Strom], Karen [Brenner], and Mark [Strom]. Susan—Bernee and Mark will both be out of town in separate locations from Tuesday until Friday. Please prepare the extension today and get it to us via fax . . . , so that we can execute and submit it, or submit it directly, extending our filing date with the IRS to October 15. We are choosing the October 15 filing date instead of October 30 as per your suggestion.[27] Thanks.

Within hours, on the same date, Ms. Swartz responded to Dr. Strom's email, writing: "The extension went out today—I can sign as representative. A copy has been forwarded to Mark & Bernee also."

---

[27] On August 9, 2001, Ms. Swartz had emailed Mr. Cowan, Dr. Strom, Mrs. Strom, and Ms. Brenner with an update regarding filing options for the Stroms' 2000 return.

**[\*19]** V.    *Negotiations with Bank of America Over the Defaulted $10 Million Loan*

At some point after February 1, 2001, Bank of America declared the Stroms in default of the BoA Loan Agreement; and the $10 million principal payment, for which each of the Stroms was personally liable, became immediately due thereunder.    Negotiations with the bank ensued, in which Dr. Strom participated.    Mr. Cowan represented the Stroms in those negotiations.    The Stroms sought an extension of the due date for repayment, representing that they anticipated a significantly reduced tax liability for 2000 as a result of the reporting position that would be taken on their return with respect to the income attributable to Mrs. Strom's exercise of the InfoSpace stock options. Dr. and Mrs. Strom sent a "corrected" financial statement to the bank that listed their anticipated 2000 tax liability as $11.4 million— as compared to an estimated $20 million liability that the Stroms had estimated in a previous financial statement provided to the bank sometime before January 31, 2001.

Negotiations between the Stroms and Bank of America continued until late June 2001, culminating in a resolution agreement dated June 28, 2001 (Resolution Agreement).    Pursuant to the Resolution Agreement, and for the purpose of resolving the default under the BoA Loan Agreement, the Stroms agreed, inter alia (1) to execute, contemporaneously with the Resolution Agreement, "Amendment No. 4 to Individual Loan Agreement" (Amendment No. 4);[28] (2) to execute, contemporaneously with the Resolution Agreement, a deed of trust on the Kirkland condominium and a mortgage on a farm they owned in Iowa; (3) to execute, contemporaneously with the Resolution Agreement, an "Assignment of IRS Refunds" and a "Security Agreement," described more fully below; (4) to instruct KPMG "to include on Line 67(b)" of the Stroms' 2000 return, and any and all amended returns for 1998 or 1999, "the routing number of the bank for the Vandeburg [sic] Johnson & Gandara trust account, . . . [a number ending in] 0105, and their trust account number, . . . [a number ending in] 4542"; (5) to file their 2000 return no later than October 15, 2001; (6) to pay to Bank of America, contemporaneously with the execution of the Resolution Agreement, $750,000 to be applied to the principal owing under the BoA Loan Agreement (thereby reducing the principal amount due from $10 million

---

[28] Among other things, Amendment No. 4 extended the date during which the $10 million line of credit would be available, and by which the Stroms would be required to repay in full all principal and interest to June 28, 2003.

**[\*20]** to $9.25 million), and $295,832.71 to be applied to the interest due under the BoA Loan Agreement as of the date of the Resolution Agreement; (7) to pay $4.25 million to Bank of America in one or more payments on or before September 28, 2002, to be applied against the principal balance owing under the BoA Loan Agreement (thereby reducing the principal amount due to $5 million); and (8) to provide, within five days of filing it, a full and complete copy of their 2000 return, and full and complete copies of all amended returns filed for 2000, 1999, and 1998 within five days of filing the same.

In addition to the foregoing requirements, the Resolution Agreement included the following paragraph:

> 10. Mark G. Strom and Bernee D.L. Strom hereby acknowledge and represent to Bank [of America] that they are both Trustees and Beneficiaries of the Strom Family Trust and as such, they will benefit individually as a result of entering into this Agreement, the "Assignment of IRS Refunds", and "Amendment No. 4 to Individual Loan Agreement".

Dr. Strom signed the Resolution Agreement.

Contemporaneously with the Resolution Agreement and in accordance therewith, the Stroms executed an assignment of IRS refunds dated June 28, 2001 (Assignment of IRS Refunds), and a security agreement dated June 28, 2001 (Security Agreement).

Pursuant to the Assignment of IRS Refunds, the Stroms irrevocably assigned to Bank of America all of their "right, title and interest in and to any and all IRS tax refunds to which . . . [the Stroms were] entitled." The Assignment of IRS Refunds included the following paragraph:

> Strom[29] hereby instructs KPMG to file their 1040 Federal Income Tax Return no later than October 15, 2001 and to include on Line 67(b) the routing number for the bank for the trust account of the law firm of [Mr. Cowan], . . . [a number ending in] 0105, and to include on Line 67(d) the trust account number of that law firm, which trust account number is . . . [a number ending in] 4542. Strom further

---

[29] The Assignment of IRS Refunds defined "Strom" to refer collectively to "Mark G. Strom and Bernee D.L. Strom."

**[\*21]**  instruct [sic] KPMG to provide the same information on all filings for amended returns for the years 1998, 1999, and 2000.

Dr. Strom signed the Assignment of IRS Refunds.

Pursuant to the Security Agreement, the Stroms granted Bank of America a continuing security interest in "all refunds due or which become due from the Internal Revenue Service to Debtor,[30] including but limited to all refunds due to Debtor from the Internal Revenue Service for Debtors' 2000 tax return and any amended returns with regard thereto and with respect to all amended returns for 1999 and earlier." Dr. Strom signed the Security Agreement.

Thereafter, Dr. and Mrs. Strom signed a joint return for 2000 claiming a $15,033,879 refund for that year; directing that it be electronically deposited in the client trust account of Mr. Cowan's law firm (client trust account); and assigning $9,263,489.59 of that amount to Bank of America to satisfy the $10 million BoA Loan in full.

VI.  *The 2000 Return and the $15,033,879 Refund*

    A.    *The 2000 Return*

During the preparation of the 2000 return, both Dr. and Mrs. Strom provided the return preparer, KPMG, with relevant tax documents. Among the documents provided to KPMG by Dr. Strom was the Form W–2 issued to him by Asterion, reporting wages of $95,438.32. That Form W–2 and the four Forms W–2 issued to Mrs. Strom by InfoSpace, with the latter reporting total wages of $106,526,884.44, were attached to the Stroms' 2000 return.[31]

---

[30] The security agreement defined "Debtor" to refer to "Mark G. Strom and Bernee D.L. Strom, Individually and as Trustees of the Strom Family Trust dated July 22, 1982, as Amended and Completely Restated on October 9, 1996."

[31] The parties have stipulated that the four Forms W–2 issued by InfoSpace to Mrs. Strom were attached to the Stroms' 2000 return. However, the Exhibit which the parties have stipulated as a true and correct copy of the Stroms' 2000 return includes only three Forms W–2 issued by InfoSpace. Additionally, the Exhibit which the parties have stipulated as "a copy of the Stroms' [Form] W–2 information for taxable year 2000, which was attached to their filed 2000 return" also includes only three Forms W–2 issued by InfoSpace. Nevertheless, the Stroms included an instruction on line 7 ("Wages, salaries, tips, etc.) of their Form 1040 for 2000, stating: "See Statement 1." "Statement 1" attached to the 2000 return disclosed the four InfoSpace Forms W–2

**[\*22]** After being advised of the Section 16(b) Position and the Pooling-of-Interests Position, the levels of authority supporting them, and the associated risks, Dr. and Mrs. Strom, in consultation with their counsel, together chose to adopt those positions on the 2000 return for purposes of reporting the income attributable to Mrs. Strom's InfoSpace option exercises in 2000. When the Stroms made choices on the 2000 return, they did so together after discussing the matter in question.

On line 7 ("Wages, salaries, tips, etc.") of their 2000 return, the Stroms reported total wages of $6,200,830. However, on the same line of the return, the Stroms included a typewritten instruction to "See Statement 1." A corresponding document marked "Statement 1" was attached as a supplement to the return (Statement 1). Among other things, Statement 1 included a table titled "Sources of Compensation" setting forth the following information with respect to the Stroms' Form W–2 income for 2000:

| Description | Total Wages | Federal Withheld | Soc. Sec. Withheld | Medicare Withheld |
|---|---|---|---|---|
| WAGES | | | | |
| ICOPYRIGHT INC | $114,334 | $27,985 | $4,724 | $1,658 |
| ASTERION COM INC | 95,439 | | 4,724 | 1,536 |
| INFOSPACE COM INC | 10,421,734 | | | 151,115 |
| INFOSPACE COM INC | 10,421,734 | | | 151,115 |
| INFOSPACE COM INC | 15,993,750 | 4,478,250 | | 231,909 |
| INFOSPACE COM INC | 69,689,666 | 17,574,214 | 4,724 | 1,010,652 |
| SEE FORM 8275 | (100,535,827) | | | |
| **TOTAL - WAGES** | **$6,200,830** | **$22,080,449** | **$14,172** | **$1,547,985** |

Additionally, a Form 8275, Disclosure Statement, was attached to the 2000 return. The Form 8275 disclosed a compensation item of $100,535,827 and attached the Disclosure Statement previously discussed.

Dr. Strom read and approved the Disclosure Statement before he signed the 2000 return. At that time, he understood that the Disclosure Statement advised the IRS that the Stroms were not reporting certain income attributable to Mrs. Strom's InfoSpace option exercises in 2000,

---

issued to Mrs. Strom and the amounts reported therein. Consequently, we are satisfied that the parties' stipulation is substantively accurate notwithstanding the contents of the Exhibits they reference.

[*23] and that the income would instead be reported on their return for 2001.

Dr. Strom reviewed the 2000 return, including the Forms W–2 information attached thereto, before signing it. At the time he signed the 2000 return, Dr. Strom was aware that, with respect to the amount of income attributable to Mrs. Strom's InfoSpace option exercises in 2000, there was a discrepancy between the amount reported on the InfoSpace Forms W–2 for that year and the amount reported on the Stroms' return. He was also aware of the Stroms' outstanding $10 million loan with Bank of America.

B.    *The $15,033,879 Refund*

The Stroms claimed a $17,033,879 overpayment on the 2000 return. After discussing the matter, the Stroms together chose to claim a $15,033,879 refund and apply $2 million to their estimated tax for 2001. The Stroms also together chose to direct that the $15,033,879 refund be electronically deposited in the client trust account.

On November 7, 2001, pursuant to the Stroms' instructions on the 2000 return, the $15,033,879 refund was wired to the client trust account. On the same date, two checks were drawn on the client trust account: (1) a check for $9,263,489.59, issued to Bank of America, to satisfy in full the $10 million BoA Loan; and (2) a check for $5,770,389.41, issued to the Stroms. On the same date the Stroms together chose to initially deposit the $5,770,389.41 check in an account at Bear Stearns ending in 5308 that Dr. and Mrs. Strom jointly controlled in the name of the Strom Family Trust of 1982 (Strom Family Trust 5308 Account). Two days later, on November 9, 2001, the Stroms wired that same amount from the Strom Family Trust 5308 Account to an account at Dreyfus ending in 4268 that Dr. and Mrs. Strom also jointly controlled in the name of the Strom Family Trust of 1982 (Strom Family Trust 4268 Account). During the relevant period, Dr. Strom had full access to, and signatory authority over the funds held in, the Strom Family Trust 5308 Account and the Strom Family Trust 4268 Account.

At trial, both Dr. and Mrs. Strom professed to have no recall concerning the disposition of the $5,770,389.41 balance of the $15,033,879 refund that was paid to them after Bank of America was paid. As discussed more fully hereinafter, most of the remaining $5,770,389.41, after being subject to a series of transfers among accounts jointly controlled by Dr. and Mrs. Strom, was invested in Belle

[*24] Point Ltd., an offshore company indirectly owned by the Stroms during the relevant period and formed in part for the purpose of making their assets more difficult to seize by potential creditors.

VII.    *Kenneth A. Ziskin and the Stroms' Asset Protection Plan*

Upon becoming the Stroms' financial adviser in November 2001, Ms. Brenner recommended that they engage attorney Kenneth A. Ziskin to revise their estate plan and "add some robust asset protection" features that would protect their assets from potential creditors and liabilities.   Thereafter, pursuant to an estate planning engagement letter executed by both Dr. and Mrs. Strom on November 28, 2001, the Stroms jointly retained Mr. Ziskin for the foregoing purposes.

That same day, the Stroms formed the Sugar Creek Limited Partnership, an Alaska limited partnership (Sugar Creek LP).   The entity was organized in part to protect Dr. and Mrs. Strom's assets from the claims of future creditors by making their interests in the entity unattractive to creditors.   Upon formation, Dr. and Mrs. Strom owned more than 99% of Sugar Creek LP, either directly or as trustees of the Strom Family Trust of 1982.   Both Dr. and Mrs. Strom also served as trustees of Carillon Management Trust, the general partner of Sugar Creek LP, which held an interest of less than one percent.

On November 30, 2001, as part of the formation of Sugar Creek LP, Dr. and Mrs. Strom each executed a Joint Comprehensive Transfer Document.   Dr. and Mrs. Strom each executed the instrument in their capacities as individuals and trustees of the Strom Family Trust of 1982 and as trustees of the Carillon Management Trust; that is, the then-general partner of Sugar Creek LP.   By the instrument, Dr. and Mrs. Strom together transferred total assets with an estimated fair market value of $12,735,000, and in exchange each received a near 50% limited partnership interest.   Of the $12,735,000 transferred by the Stroms to Sugar Creek LP from the Strom Family Trust of 1982, $4,970,389 was transferred from the Strom Family Trust 5308 Account and was, as discussed hereinafter, traceable to the $5,770,389.41 portion of the refund claimed on the Stroms' 2000 return that was paid out to them.

As part of the Stroms' estate planning engagement with Mr. Ziskin, they also formed Belle Point Ltd., a Saint Lucia international business company (IBC), which was incorporated in February 2002. Belle Point Ltd. was owned by Sugar Creek LP, and therefore indirectly owned by Dr. and Mrs. Strom, who also served as directors for Belle

[*25] Point Ltd. Belle Point Ltd. was formed to hold investment assets of Sugar Creek LP; to enable such investment assets to be held and managed in offshore accounts without raising U.S. securities law concerns for the investment managers; and to make the Stroms' assets more difficult to seize by potential creditors. Of the funds that the Stroms would subsequently invest in Belle Point Ltd., at least $3,186,000 is traceable to the $5,770,389.41 of the $15,033,879 refund claimed on the Stroms' 2000 return that was paid out to them.

In March 2002 the Stroms created Mingus Investors, LLC, a Delaware limited liability company, through Mr. Ziskin, to extract value from the Kirkland condominium by lending the equity in the property to third parties and to pay for the costs of owning and maintaining the residence. The Stroms transferred the Kirkland condominium to Mingus Investors, LLC, in 2002.

Over the course of the Stroms' estate planning engagement with Mr. Ziskin, Dr. Strom personally communicated with Mr. Ziskin and dispersed funds to him.

VIII. *Disposition of the Remaining Refund Amount*

As noted, on November 7, 2001, the Stroms initially deposited the $5,770,389.41 portion of their 2000 refund paid to them into the Strom Family Trust 5308 Account, before directing a transfer of that same amount two days later to the Strom Family Trust 4268 Account.

Thereafter, on December 3, 2001, the Stroms transferred $4,970,389 of that amount from the Strom Family Trust 4268 Account *back* to the Strom Family Trust 5308 Account. On the next day, December 4, 2001, the Stroms transferred that same amount (i.e., $4,970,389) from the Strom Family Trust 5308 Account to an account at Bear Stearns ending in 0264 that Dr. and Mrs. Strom jointly controlled during the relevant period in the name of Sugar Creek LP (Sugar Creek 0264 Account). The Stroms left those funds in the Sugar Creek 0264 Account through the end of December 2001 and most of January 2002.

However, between January 28 and April 16, 2002, the Stroms transferred a total of $1,787,840.97 from the Sugar Creek 0264 Account to (and through) other accounts under their joint control.[32] When

_____

[32] On January 28, 2002, the Stroms transferred $101,340.97 from the Sugar Creek 0264 Account back to the Strom Family Trust 5308 Account. On January 29,

**[\*26]** coupled with certain other transfers from the Strom Family Trust 4268 Account,[33] these transfers resulted in the total transfer of $1,311,600 to the Strom Family Trust 0144 Account and $825,000 to the Strom Family Trust 7623 Account during the aforementioned (nearly) three-month period. All of the funds involved in these transfers can be traced to the $5,770,389.41 portion of the $15,033,879 refund claimed on the Stroms' 2000 return that was paid to them.

Thereafter, on April 25, 2002, the Stroms transferred $3,186,600 from the Sugar Creek 0264 Account to an account at Goldman Sachs ending in 8814 that Dr. and Mrs. Strom jointly controlled during the relevant period in the name of the Sugar Creek LP (Sugar Creek 8814 Account). Four days later, on April 29, 2002, the Stroms transferred $3,186,000 from the Sugar Creek 8814 Account to the client trust account of Mr. Ziskin. At the Stroms' direction, and on their behalf, on

---

2002, those funds were bundled with an incoming transfer of $148,880.30 from the Strom Family Trust 4268 Account, culminating in a transfer of $250,000 from the Strom Family Trust 5308 Account to a bank account at Wells Fargo ending in 7623 that Dr. and Mrs. Strom jointly controlled in the name of the Strom Family Trust of 1982 (Strom Family Trust 7623 Account).

On January 31, 2002, the Stroms transferred $437,100 from the Sugar Creek 0264 Account back to the Strom Family Trust 5308 Account.

On the same date, the Stroms then transferred that $437,100 from the Strom Family Trust 5308 Account to an account at Citibank ending in 0144 that Dr. and Mrs. Strom jointly controlled in the name of the Strom Family Trust of 1982 (Strom Family Trust 0144 Account).

On February 1, 2002, the Stroms transferred $874,500 from the Sugar Creek 0264 Account back to the Strom Family Trust 5308 Account. On the same date, the Stroms then transferred that $874,500 from the Strom Family Trust 5308 Account to the Strom Family Trust 0144 Account.

On April 16, 2002, the Stroms transferred $375,000 from the Sugar Creek 0264 Account back to the Strom Family Trust 5308 Account. On the same date, the Stroms then transferred that $375,000 from the Strom Family Trust 5308 Account to the Strom Family Trust 7623 Account.

[33] On December 26, 2001, the Stroms transferred $200,000 from the Strom Family Trust 4268 Account back to the Strom Family Trust 5308 Account. On the same date, the Stroms then transferred that $200,000 from the Strom Family Trust 5308 Account to the Strom Family Trust 7623 Account.

As noted, on January 29, 2002, the Stroms transferred $148,880.30 from the Strom Family Trust 4268 Account back to the Strom Family Trust 5308 Account. On the same date those funds were bundled with a previous transfer of $101,340.97 from the Sugar Creek 0264 Account, culminating in a transfer of $250,000 from the Strom Family Trust 5308 Account to the Strom Family Trust 7623 Account.

[*27] April 30, 2002, Mr. Ziskin transferred $3,486,600[34] from his client trust account to an account at Goldman Sachs ending in 0255 that Dr. and Mrs. Strom jointly controlled during the relevant period in the name of Belle Point Ltd. (Belle Point Ltd. 0255 Account).

During the relevant period, Dr. Strom had full access to, and signatory authority over the funds held in, each of the accounts referenced in this Part VIII.

IX.   *U.S. District Court Refund Suit*

At the in-person meeting on June 13, 2001, the Stroms and their advisers discussed the timing and advisability of the Stroms filing an joint amended return for the taxable year 1999 for purposes of treating Mrs. Strom's InfoSpace options exercised in that year consistently with the tax treatment of her options exercised in 2000.[35] This discussion extended to strategies involving a potential suit for refund in U.S. District Court and how such a suit might implicate the taxable year 2000. The discussion also extended to how an audit of the 2000 return might affect the decision whether to file an amended return for 1999, with at least some advisers counseling that, if the 2000 return were not selected for an audit, then the Stroms should not file an amended return.

At some point before September 25, 2002, the Stroms received a notice of IRS examination with respect to the 2000 return. Thereafter, the Stroms filed an amended return for 1999, seeking a refund of income taxes paid for that year. Additionally, the Stroms filed a Form 843, Claim for Refund and Request for Abatement, seeking refund of Medicare taxes paid for 1999 and 2000. Both claims were generally premised upon the same deferral strategy adopted on the Stroms' 2000 return; namely, that the calculation and recognition of income attributable to InfoSpace option exercises by Mrs. Strom in 1999 and 2000 was deferred until January 2001 because, pursuant to a combination of restrictions under section 83(c)(3) and Treasury

---

[34] One day before the above-described transfer, the Stroms had made a transfer to the client trust account of Mr. Ziskin, which was the source of the additional $300,600. We need not discuss that transfer further here, as the tracing thereof reveals no relationship to the refund claimed on the 2000 return.

[35] On their joint federal income tax return for 1999, the Stroms had reported all of the income shown on the Form W–2 issued by InfoSpace to Mrs. Strom for that year—including the income attributable to the exercise of InfoSpace stock options— as taxable income.

[*28] Regulation § 1.83-3(k), her rights to the property were subject to a substantial risk of forfeiture and not transferable.

When the IRS failed to act on the foregoing claims, the Stroms brought suit in the U.S. District Court for the Western District of Washington.[36] The Government moved for summary judgment and the Stroms moved for partial summary judgment in that case. The District Court thereafter held (1) that Mrs. Strom was entitled to defer under section 83(c)(3) the calculation and recognition of the income attributable to the InfoSpace option exercises in 1999 and 2000 until December 23, 2000,[37] but (2) that Mrs. Strom was not entitled to further defer the tax consequences of those option exercises into 2001 under

[36] *See Strom v. United States*, No. 2:06cv802 (W.D. Wash. filed June 8, 2006). A court may take judicial notice of another court's records, and, finding that the Stroms' refund suit has a direct relation to the matters at issue, we take notice of the proceedings in that suit before both the U.S. District Court and the Ninth Circuit. *See United States ex rel. Robison Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (collecting cases) (explaining that a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979))); *Kasper v. Commissioner*, 150 T.C. 8, 12 n.3 (2018).

[37] In ruling on the parties' cross-motions, the District Court rejected the Stroms' argument that each option vesting date should be considered a "purchase" for purposes of applying section 16(b) of the Exchange Act, holding instead that the acquisition date of the options constitutes the purchase date. Because Mrs. Strom acquired her InfoSpace options in November 1998, the District Court concluded that Mrs. Strom was free to sell her InfoSpace stock in 1999 and 2000.

Nevertheless, the District Court also held that, with respect to their burden of proof, the Stroms had to show only that a sale of InfoSpace shares could have subjected Mrs. Strom to a suit under section 16(b) of the Exchange Act—not that such a sale could have subjected her to liability thereunder. Thus, the District Court held that, even though "a full and complete review of the relevant authority" would have resulted in such a suit failing as a matter of law, the suit would not have been frivolous for purposes of sanctions under Rule 11 of Federal Rules of Civil Procedure (Fed. R. Civ. P.), and Mrs. Strom "would have had to marshal resources and successfully argue matters of first impression in order to defeat such a suit." *Strom*, 583 F. Supp. 2d at 1270.

Accordingly, the District Court granted the Stroms' motion in part, holding that under section 83(c)(3) Mrs. Strom's rights in the InfoSpace shares were subject to a substantial risk of forfeiture and not transferable until December 23, 2000, six months after her last vesting date. As discussed hereinafter, the Ninth Circuit reversed the District Court on this point, holding that, rather than a Fed. R. Civ. P. 11 frivolousness standard, a person seeking to defer tax consequences under section 83(c)(3) must show that, if she sold stock and a suit under section 16(b) of the Exchange Act was brought against her, the suit would have had "an objectively reasonable chance" of success. *See Strom*, 641 F.3d 1051.

**[\*29]** Treasury Regulation § 1.83-3(k), as Mrs. Strom faced no risk of forfeiture because of the pooling-of-interests accounting rules.[38] *See Strom*, 583 F. Supp. 2d 1264. Thus, the District Court granted in part, and denied in part, each party's motion.

On March 6, 2009, the Government filed a Notice of Appeal, appealing the District Court's holding that Mrs. Strom was entitled to defer to a significant extent the calculation and recognition of the income attributable to the InfoSpace option exercises in 1999 and 2000. On March 12, 2009, Dr. and Mrs. Strom filed a Notice of Cross Appeal.

X.    *Notice of Deficiency*

On April 4, 2008, respondent issued a notice of deficiency to the Stroms for the taxable year 2000.

Therein, respondent determined a deficiency of $39,812,187 in income tax for that year, arising from an unreported income adjustment of $100,535,826, representing the portion of wages reported on the Forms W–2 issued to Mrs. Strom by InfoSpace for 2000 but not reported as income on the Stroms' 2000 return. The Stroms timely petitioned this Court. Proceedings in these cases were thereafter stayed pending the resolution of the Government's appeal of the District Court's decision to the Ninth Circuit.

XI.   *Property Status Agreement*

After the issuance of the notice of deficiency, Dr. and Mrs. Strom executed a Property Status Agreement, purporting to allocate certain interests in existing joint assets, including the Kirkland condominium (via Mingus Investors, LLC), to Dr. Strom as his sole and separate property. In connection with the matter, Dr. Strom retained attorney Robert Baker on or about March 9, 2009. Mr. Baker commenced the engagement by conducting a teleconference on the foregoing date with Mr. Hallett, who at that time was representing the Stroms in their refund suit and who had referred Dr. Strom to Mr. Baker. Mr. Baker thereafter conducted a teleconference with Dr. Strom on March 17, 2009;

---

[38] In ruling on the parties' cross-motions, the District Court interpreted Treasury Regulation § 1.83-3(k) to restrict only postmerger sales of stock (and not premerger sales—an interpretation for which the Stroms had argued). As discussed hereinafter, the Ninth Circuit disagreed with that interpretation and remanded to the District Court for further proceedings to develop facts as to the pooling-of-interests issue. However, the District Court docket record indicates that no further proceedings were held.

**[\*30]** a teleconference with Mr. Hallett on March 18, 2009; and teleconferences with both Dr. Strom and Mr. Hallett on March 19, 2009.[39] On March 23, 2009, Dr. Strom and Mr. Baker held their first in-person conference.

On April 6, 2009, Mr. Hallett referred Mrs. Strom to attorney Pamela McClaran, whom Mrs. Strom subsequently retained at some point before May 15, 2009, in connection with the Property Status Agreement matter. Mr. Baker and Ms. McClaran then worked together to produce an initial draft of an agreement, which was forwarded to the Stroms on July 30, 2009.

On August 4, 2009, Mr. Baker, Ms. McClaran, Dr. Strom, Mrs. Strom, and Ms. Brenner held an in-person conference regarding the matter. Thereafter, by letter dated August 25, 2009, Mr. Baker wrote to Dr. and Mrs. Strom on behalf of himself and Ms. McClaran to provide a summary of the decisions that were reached during that meeting. Among other things, the letter advised that, under the draft Property Status Agreement, the Kirkland condominium would be transferred from Mingus Investors, LLC, to Dr. and Mrs. Strom in equal shares as tenants-in-common, and, thereafter, Dr. and Mrs. Strom would each transfer his or her one-half interest to a qualified personal residence trust.

After over four months of additional meetings between the Stroms and their respective attorneys, Mr. Baker sent an email on January 19, 2010, to Dr. Strom and Ms. McClaran, attaching thereto a revised draft for their review. This January 2010 draft of the agreement likewise allocated the Kirkland condominium equally between Dr. and Mrs. Strom (via 50% interests in Mingus Investors, LLC).

There was no recorded activity on the draft Property Status Agreement until April 11, 2010, when Dr. Strom sent an email to Mr. Baker requesting a teleconference and advising him that the Stroms "would like to work with one attorney only for the purpose of keeping costs as low as possible." Thereafter, on April 20, 2010, Mr. Baker, Dr. Strom, Mrs. Strom, and Ms. Brenner (but not Ms. McClaran) held a teleconference during which the Stroms expressed their desire to allocate the Kirkland condominium entirely to Dr. Strom.

---

[39] On June 3 and 16, 2009, Mr. Baker conducted additional teleconferences with Mr. Hallett in connection with the Property Status Agreement matter.

**[*31]** Ms. McClaran did not participate in any further discussions concerning the draft Property Status Agreement.

From April 20 to June 28, 2010, there was almost no activity with respect to the agreement. However, on the latter date, Dr. Strom sent Mr. Baker an email with the subject line "let's get it signed," stating:

> Bernee and I would like to get our post nupt and supportive documents signed ASAP, finally. If there are any modifications we can deal with that later. Please advise regarding how we can make that happen. We can come down to your office as soon as is practicable in order to get things wrapped up. Please get back to me as soon as you can. Thanks.

In response, on June 29, 2010, Mr. Baker wrote to Dr. Strom (with Mrs. Strom copied):

> As I recall—I am at home at the moment, without the files—a complete overhaul of the arrangement was where we were heading in our last conversation; to wit, the entire condo was to go into your column based on a very substantial increase in the value of Bernee's stock in Ensequence. To support this revision, Bernee and Karen were to get support for the new valuation of Ensequence to me. Then, I would revise the property settlement agreement, and we would have to consider how we might deal with the history of correspondence that Pamela [McClaran] and I crafted to show the rationale for the arrangement previously proposed (which divided the condo equally between you and Bernee because there was not sufficient value in her column to totally allocate the condo to you.)
>
> So, I can have the docs ready to sign later this week if the old deal is still in the works. Otherwise, can Bernee and Karen justify the new deal proposed in our last call? I haven't heard anything since our call. If the new deal is on, with good support, I will try to get to making revisions over the holiday weekend and get it to you next week—and deal with getting Pamela to sign off.

On the same date, Mr. Baker followed up with another email to Dr. Strom (with Mrs. Strom copied): "I am now at the office looking at

**[\*32]** my notes from our teleconference on April 20—Bernee expected to be receiving an additional 1 million shares, the value of which would allow us to move the condo to Mark. Did that happen?"

On the same date, Dr. Strom replied to Mr. Baker (with Mrs. Strom copied) and advised that "Bernee did not receive the additional 1 million shares" but that he nevertheless thought "we should try to stretch her equity as far as we can push it now, get the agreement signed the way things are now, and then we can make changes later if necessary."[40] Dr. Strom added: "If we wait any longer the clock will catch up with us. . . . [W]e probably cannot afford that."

Thereafter, on the same date, Mr. Baker replied to Dr. Strom (with Mrs. Strom copied), writing in relevant part: "I agree about stretching the equity. Can Bernee or Karen give me more support— involving the new business or otherwise?"

On July 2, 2010, after apparently not receiving a response to the just referenced email, Mr. Baker sent a followup email to Dr. Strom (with Mrs. Strom copied), writing in relevant part: "I agree that we need to get documents signed. But, can Bernee or Karen give me some ammunition to add value in Bernee's column for the new ventures—and increase your share of the condo accordingly?"

On July 5, 2010, Dr. Strom responded to Mr. Baker by email (with Mrs. Strom copied) to apologize "that . . . [Mr. Baker] had to ask . . . [them] for numbers several times" and to advise that "Bernee and Karen ran through some figures and there most definitely are numbers which will swing Bernee's share over the critical point." He further advised that Ms. Brenner would be sending Mr. Baker an email with those figures.

On July 6, 2010, Ms. Brenner sent an email to Dr. Strom and Mr. Baker (with Mrs. Strom copied) stating in relevant part:

> Bernee is still in negotiation with Ensequence but given
> the status, she assured [sic] of receiving additional value

---

[40] At trial, Mr. Baker testified that in his view the phrase "stretch the equity," as used in the context above, meant finding "some [value-related] figures" to allocate to Mrs. Strom's side of the column that in turn "would justify an allocation to the— of the house to Mark's side of the column." When asked to clarify whether "stretching the equity" specifically meant finding a way to allocate the Kirkland condominium entirely to Dr. Strom, Mr. Baker testified: "Darn right," that Dr. Strom "wanted the house," and Mr. Baker "wanted to help him."

**[*33]** for her Board representation for the past 8 years, which up to now has not been compensated. This recognition is being offered by the major funding source out of his personal holdings in the company and is an allocation of his proceeds to her. We ran an analysis of the current deal offered to Bernee and believe, depending upon the ultimate sales of the company as provided by the company that it is currently worth between $640,000 and $1.28 million. We believe Bernee will realize a better arrangement than that currently offered but given what is on the table, I believe you can safely assume some value which will substantiate the position that both Mark and Bernee have agreed to re: the allocation of their assets.

On July 9, 2010, Mr. Baker sent an email to Dr. and Mrs. Strom, attaching, inter alia, a revised copy of the Property Status Agreement.[41] In the email, he described several changes that he had made "in order to make the numbers work":

> You will see that I have juggled assets and liabilities in the PSA. I have not stated the condo debt as a liability in B's column, but it is implied given her obligation to pay ½ of the debt in lieu of rent while she occupies the condo. I have also eliminated the deferred tax liabilities of . . . Mark's retirement plans in order to make the numbers work. Let me know what you think. I will noodle over what changes if any need to be made in the correspondence trail that I have with Pamela. I think I can avoid making any such changes by a new letter introducing the new Ensequence stock and the plan to shift the condo to M.

On July 24, 2010, Mr. Baker held a teleconference with Dr. Strom, Mrs. Strom, and Ms. Brenner, during which the parties discussed the upcoming oral argument in the Stroms' refund suit calendared for August 5, 2010, before the Ninth Circuit.

---

[41] Mr. Baker would subsequently explain to Dr. Strom, in an email sent on March 11, 2014, that a "math error" resulting in a $2 million overstatement of the total value of the assets allocated to Mrs. Strom arose in this draft of the Property Status Agreement, which "moved the condo asset and liability (via Mingus) to your column and awarded the anticipated additional Ensequence shares to Bernee."

**[\*34]** On or about July 26, 2010, Dr. and Mrs. Strom executed the Property Status Agreement. Mr. Baker executed it on July 27, 2010.[42]

Attached to the Property Status Agreement as Exhibits A and B were two asset schedules listing the purported separate property that had been allocated to Mrs. Strom and Dr. Strom, respectively, under the agreement. Nearly all of the assets therein, including Mingus Investors, LLC, which at that time held the Kirkland condominium, were allocated using values as of April 30, 2009; that is, more than a year before the Property Status Agreement was executed. The Stroms did not obtain a formal appraisal of the Kirkland condominium before executing the Property Status Agreement; instead, Mr. Baker based the valuation on quotes from Zillow and the King County Assessor. The Property Status Agreement itself states "that the valuations of assets and liabilities in the exhibits are approximate only" and that "[t]he parties agree that it is unnecessary and that it would be unduly expensive to secure formal, up-to-date, fair-market-value appraisals for all assets described in the exhibits, and each party waives such a valuation demand." The asset schedules were prepared by Mr. Baker, who obtained the values of the assets from Ms. Brenner from time to time. Mr. Baker did not consult any source documents in preparing the asset schedules and relied on the information he was provided.

The total value attributed to the assets allocated under the two asset schedules was $11,263,243. However, Exhibit A, which listed the purported separate property of Mrs. Strom, overstated by $2 million the total value of the assets allocated to her.[43] Mr. Baker was advised of this error on or about May 18, 2012,[44] but failed to advise Ms. McClaran

---

[42] It was not until November 18, 2010, that Mr. Baker sent the Property Status Agreement to Ms. McClaran for her signature. She executed it on November 22, 2010.

[43] The overstatement appears on the face of the document: If one were to add each of the 12 assets allocated to Mrs. Strom in Exhibit A and compare it to the "Total" line of Exhibit A, one would discover that the "Total" line of Exhibit A was overstated by $2 million.

[44] At trial, Mr. Baker testified that he learned of the error from Mr. Hallett's associate, Cori E. Flanders-Palmer. (Ms. Flanders-Palmer is counsel of record for Mrs. Strom in the case at Docket No. 16711-08.) The only activity in the Property Status Agreement matter listed in Mr. Baker's billing records for 2012 is from May 14 to May 18, 2012. Those records indicate that Mr. Baker had a teleconference with Mr. Hallett and Ms. Flanders-Palmer on May 18, 2012. Additionally, in an email sent to Mr. Hallett and Ms. Flanders-Palmer on May 22, 2012, Mr. Baker references "the math error that Cori caught." On the basis of the foregoing, we conclude that, at the latest, Mr. Baker was advised of the error on May 18, 2012.

**[\*35]** of the error until on or about March 13, 2014.[45]  The error was not corrected until April 3, 2014, when Dr. and Mrs. Strom executed an Amendment of Property Status Agreement, which refers to the $2 million overstatement as a "math error."  Ms. McClaran was not involved in the drafting or signing of the Amendment of Property Status Agreement.[46]

At the time Mr. Baker drafted the Property Status Agreement, he was aware that the Stroms had a potential tax liability and that Dr. Strom was seeking innocent spouse relief in connection with it.  Mr. Baker was provided with a copy of Dr. Strom's initial innocent spouse relief request.

During the engagement, Mr. Baker spent time reviewing the innocent spouse implications of the Property Status Agreement.

XII.   *Innocent Spouse Relief Requests*

   A.   *Dr. Strom's First Request for Innocent Spouse Relief*

On June 30, 2009, the IRS's Cincinnati Centralized Innocent Spouse Operation (CCISO) received a Form 8857, Request for Innocent Spouse Relief (First Form 8857), completed by Dr. Strom, requesting relief from joint and several liability with respect to the Stroms' federal income tax liability for taxable year 2000.  On his First Form 8857, Dr. Strom did not list the M.B.A. that he had obtained from UCLA in 1985, and, in the space provided on the form to list any college-level business or tax-related courses that he had completed, he wrote "None." In response to the question of whether he had a present mental or physical health problem, or such a problem at the time the 2000 return was signed, Dr. Strom checked the box indicating "No."  With respect to his involvement in the preparation of the 2000 return, Dr. Strom checked the boxes indicating (1) that he had given tax documents to the

---

[45] The record includes a memorandum dated March 13, 2014, consisting of a transcription of two voicemails left for Ms. McClaran by Mr. Baker.  At trial, Ms. McClaran testified that she first learned about the error by listening to the voicemails. It is unclear whether March 13, 2014, is the date that the voicemails were left, or the date they were transcribed, insofar as an email sent by Mr. Baker to Dr. Strom on March 11, 2014, attaching a copy of the Amendment of Property Settlement Agreement, states that Mr. Baker had left a voicemail with Ms. McClaran, "explaining the situation and advising that . . . [he would] speak with her . . . [the following day]."

[46] The only reference to Ms. McClaran listed in Mr. Baker's billing records for 2014 is on June 30, 2014.  It states: "Conference with Pamela McClaran regarding IRS contacts."

**[\*36]** person who prepared the 2000 return and (2) that he reviewed the 2000 return before it was signed. In response to the question of whether, at the time the 2000 return was signed, the Stroms were having financial problems, Dr. Strom checked the box indicating "No." Lastly, with respect to his involvement in the Stroms' household finances during 2000, Dr. Strom checked only the box indicating that he was not involved in handling money for the household. He did not check the boxes indicating that he had or used any joint accounts or that he "made decisions about how money was spent" during 2000 (e.g., "you paid bills or made decisions about household purchases").

In a one-page attachment to the First Form 8857, Dr. Strom wrote that he "did not participate in the decisions regarding the exercise of the stock options" and that he "did not make the decisions, or even participate in the decisions, regarding the reporting of the exercise of the incentive stock options."

Dr. Strom signed the First Form 8857 under penalty of perjury on June 18, 2009, and was represented by counsel in connection with the preparation of the document.

B.     *Mrs. Strom's Questionnaire for Nonrequesting Spouse*

Around the same time Dr. Strom submitted the First Form 8857, Mrs. Strom submitted a Form 12508, Questionnaire for Non-Requesting Spouse, relating to Dr. Strom's relief request for 2000. With respect to Dr. Strom's use of the Stroms' joint checking accounts during 2000, Mrs. Strom checked only the box indicating that Dr. Strom was not involved in handling money for the household. She did not, for example, check the boxes indicating that Dr. Strom paid bills or made withdrawals from such accounts. Mrs. Strom also noted, inter alia, that she had been primarily responsible for household finances during the marriage and that Dr. Strom "did not have any involvement in . . . [her] employee stock options which resulted in the additional proposed tax liability."

Mrs. Strom signed the Form 12508 under penalty of perjury.

C.     *Dr. Strom's Second Request for Innocent Spouse Relief*

In June 2012, three years after the First Form 8857 was submitted, CCISO received an additional Form 8857 (Second Form 8857) from Dr. Strom, again requesting relief from joint and several

**[\*37]** liability for 2000.[47] On his Second Form 8857 Dr. Strom listed his M.B.A. among his college degrees and, within a 17-page attachment, disclosed that, as part of his M.B.A. program, "he was required to complete typical courses such as financial planning for managers, management information systems, quantitative methods for managers, and economic analysis for managers." He additionally disclosed that he "took a single managerial accounting course" but stated that he "remembers virtually nothing from . . . [it]."

On the Second Form 8857, in response to the question of whether he had a present mental or physical health problem, or such a problem at the time the 2000 return was signed, Dr. Strom checked the box indicating "Yes." Within the aforementioned attachment to the Second Form 8857, Dr. Strom wrote that he "had been seeing psychiatrists for more than twenty years for anxiety and depression" and that "[s]ometime during the 1990s, as he transitioned from the surgeon's role he knew well to a new role of consultant and executive, his condition worsened." Dr. Strom wrote that, "[i]n addition to the use of benzodiazepines prescribed by his psychiatrists," he "began self-medicating to control his agitation, using opioids such as Vicodin" and that, "[b]y 2000," his "drug use had developed into substance abuse." He further wrote that, after Mrs. Strom discovered his drug use in 2000, he "sought professional assistance" and "began seeing a psychiatrist three times per week." Dr. Strom wrote that "[h]e was diagnosed as having an anxiety disorder, for which he continues to receive treatment," and that he "continued taking opioids until 2011 when he voluntarily entered a rehabilitation program in order to terminate his substance abuse."

Dr. Strom also wrote in the attachment that in 2006 he "was diagnosed with a melanoma that resulted in the amputation of his left thumb," that he "continues to suffer from left arm lymphedema as a complication of his melonoma surgery," and that "[t]his is a chronic condition requiring continued medical treatment for the rest of his life."

---

[47] At trial, respondent's counsel explained that, at some point after the submission of the First Form 8857, the IRS issued an internal notice regarding outstanding innocent spouse cases. That notice advised that such cases could be sent back to CCISO for further consideration. Dr. Strom's counsel at the time asked to resubmit his request for relief, along with a new form and new information, resulting in the Second Form 8857.

**[\*38]** No documentation, such as medical bills or a doctor's report or letter were attached to the Second Form 8857 (although the form in question directs the requesting spouse to provide it).

With respect to his involvement in the preparation of the 2000 return, Dr. Strom checked the boxes indicating (1) that he had given tax documents to the person who prepared the 2000 return and (2) that he did *not* review the 2000 return before it was signed. In the attachment to the Second Form 8857, Dr. Strom further wrote that, "[t]o the best of . . . [his] recollection, he did not review the 2000 tax return or the Form 8275 disclosure statement before signing."

With respect to his involvement in the Stroms' household finances during 2000, Dr. Strom checked the boxes indicating (1) that he knew Mrs. Strom had separate accounts, (2) that he had joint accounts but "had limited use of them or did not use them," and (3) that he was not involved in handling money for the household. He did not check the boxes indicating that he used any joint accounts or that he "made decisions about how money was spent" during 2000 (e.g., "you paid bills or made decisions about household purchases").

Dr. Strom signed the Second Form 8857 under penalty of perjury and was represented by counsel in preparing the document.

XIII. *Reversal by the Ninth Circuit*

As noted, the Government and the Stroms cross-appealed to the Ninth Circuit the District Court's decision in the Stroms' refund suit for 1999 income and Medicare taxes and 2000 Medicare taxes. On June 24, 2010, the Ninth Circuit issued a Notice of Oral Argument, calendaring the case for oral argument on August 5, 2010.

On April 6, 2011, the Ninth Circuit issued its opinion, reversing the District Court's holding as to Mrs. Strom's entitlement to defer under section 83(c)(3) the calculation and recognition of the income attributable to the InfoSpace option exercises in 1999 and 2000.[48] *See*

---

[48] The Ninth Circuit held that the District Court had correctly rejected the Stroms' argument that each option vesting date should be considered a "purchase" for purposes of applying section 16(b) of the Exchange Act, agreeing that the acquisition date of the options constitutes the purchase. Because Mrs. Strom acquired her InfoSpace options in November 1998, the Ninth Circuit also agreed with the District Court that Mrs. Strom was free to sell her InfoSpace stock in 1999 and 2000.

**[\*39]** *Strom*, 641 F.3d 1051. The Ninth Circuit also held that the District Court had erred in interpreting Treasury Regulation § 1.83-3(k) to restrict only postmerger sales of stock (and not premerger sales, an interpretation for which the Stroms had argued) and remanded for further proceedings to develop facts as to the pooling-of-interests issue.[49]

On April 12, 2011, Dr. Strom sent Mr. Baker, his attorney in the Property Status Agreement matter, an email, which read in full: "Lost!! Pull out the documents. Ugh." Thereafter, on April 13, 2011, Mr. Baker responded in full: "Ugh is an understatement! I am so sorry to hear this news. Yes, I will organize the documents." The "documents" referred to by Dr. Strom and Mr. Baker included the Property Status Agreement.

On May 22, 2011, the Stroms filed a petition for a panel rehearing. The Ninth Circuit denied that petition on June 7, 2011, and, on June 15, 2011, issued the mandate.

On June 22, 2011, Mr. Baker held an in-person conference in the Property Status Agreement matter with Mr. Hallett. At that time, there had been no activity in the Property Status Agreement matter since November 18, 2010, when Mr. Baker had contacted Ms. McClaran and sent the Property Status Agreement to her for signature.

XIV. *The Stroms' Net Worth*

At the time of trial, the Stroms had a net worth of at least $13,432,098.

---

But, as noted previously, the Ninth Circuit reasoned that, rather than a Fed. R. Civ. P. 11 frivolousness standard, as the District Court had applied, a person seeking to defer tax consequences under section 83(c)(3) must show that, if she sold stock and a suit under section 16(b) of the Exchange Act was brought against her, the suit would have had "an objectively reasonable chance" of success. The Ninth Circuit held that, in view of the fact that the six-month window of potential liability (following the November 1998 purchase date) had expired before Mrs. Strom had exercised any options, Mrs. Strom had not made the required showing: "A reasonably prudent and legally sophisticated person in Strom's position would have felt free to sell her property, because, if a § 16(b) suit had been brought against her, she would not have been forced to forfeit the profit obtained by the sale, nor would she have faced substantial legal expenses defending herself in a suit not readily dismissable." *Strom*, 641 F.3d at 1068.

[49] As noted, the District Court docket record indicates that no further proceedings were held following the remand.

**[*40]**                                    OPINION

Married taxpayers may elect to file a joint federal income tax return. § 6013(a). After making this election, each spouse is jointly and severally liable for the entire tax due for that year. § 6013(d)(3); *Butler v. Commissioner*, 114 T.C. 276, 282 (2000). In certain circumstances, however, a spouse who has filed a joint return may seek relief from joint and several liability under procedures set forth in section 6015. § 6015(a), (f).

A requesting spouse may request relief from liability under section 6015(b) or, if eligible, may allocate liability according to provisions under section 6015(c). § 6015(a). If relief is not available under section 6015(b) or (c), an individual may seek equitable relief under section 6015(f). In determining whether a taxpayer is entitled to relief under section 6015(b), (c), or (f), we apply a de novo standard and scope of review.[50] *See Porter v. Commissioner*, 132 T.C. 203, 210 (2009). Unless otherwise provided in section 6015, the taxpayer bears the burden of proving entitlement to such relief. Rule 142(a); *Alt v. Commissioner*, 119 T.C. 306, 311 (2002), *aff'd*, 101 F. App'x 34 (6th Cir. 2004).

Dr. Strom seeks relief from joint and several liability under either section 6015(b) or (f).[51] For the reasons that follow, we hold that neither section 6015(b) nor (f) entitles Dr. Strom to such relief.

I.    *Relief Under Section 6015(b)*

Section 6015(b) requires a spouse requesting relief from joint and several liability to establish each of the following: (1) a joint return was filed for the taxable year; (2) there is an understatement of tax attributable to erroneous items of the nonrequesting spouse; (3) in signing the return, the requesting spouse did not know, and had no reason to know, that there was an understatement; (4) taking into account all of the facts and circumstances, it would be inequitable to hold the requesting spouse liable for the deficiency in tax for such taxable year attributable to such understatement; and (5) a timely

---

[50] Because Dr. Strom filed his Petition before July 1, 2019, section 6015(e)(7) does not apply to his case. *See Sutherland v. Commissioner*, 155 T.C. 95, 104 (2020).

[51] As noted, Dr. Strom is ineligible for relief under section 6015(c) because at all relevant times he has been married to and living with Mrs. Strom.

**[\*41]** election was made under section 6015(b).[52] These conditions are stated in the conjunctive, and the requesting spouse must satisfy all five in order to be awarded relief. *See Alt*, 119 T.C. at 313.

There is no dispute as to whether Dr. Strom satisfies the first, second, and fifth conditions: The Stroms filed a joint return for 2000, the understatement is attributable to Mrs. Strom's omitted income, and Dr. Strom's request for relief was timely. Accordingly, Dr. Strom must establish that he did not know and had no reason to know of the understatement and that it would be inequitable to hold him liable for the deficiency attributable thereto.

A.      *Section 6015(b)(1)(C)*

Section 6015(b)(1)(C) requires a spouse requesting relief from joint and several liability to establish that he did not know and had no reason to know of the understatement of tax on the joint return. In cases involving an understatement arising from an omission of income, as here, courts have consistently held that the requesting spouse's "actual knowledge of the underlying transaction that produced the income is sufficient to preclude innocent spouse relief (the 'knowledge-of-the-transaction test')."[53] *Cheshire v. Commissioner*, 282 F.3d at 333; *see also*

---

[52] Section 6015(b) was enacted as part of the Internal Revenue Service Restructuring and Reform Act of 1998, which simultaneously repealed section 6013(e). *See* Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3201, 112 Stat. 685, 734–40. However, some of the conditions for relief under section 6015(b) are "virtually identical" to those found in the former section 6013(e), *see Jonson v. Commissioner*, 118 T.C. 106, 119 (2002), *aff'd*, 353 F.3d 1181 (10th Cir. 2003), and therefore cases interpreting the former section 6013(e) remain instructive in our analysis of the parallel conditions of section 6015(b), *see Cheshire v. Commissioner*, 282 F.3d 326, 331 n.9, 332 n.15 (5th Cir. 2002), *aff'g* 115 T.C. 183 (2000); *Butler*, 114 T.C. at 283; *Doyle v. Commissioner*, T.C. Memo. 2003-96, slip op. at 13 n.11, *aff'd*, 94 F. App'x 949 (3d Cir. 2004). This includes the third and fourth conditions listed above that are in dispute in these cases.

[53] Dr. Strom argues that the knowledge-of-the-transaction test is improper because it conflicts with the plain meaning of section 6015(b)(1)(C), which limits relief to spouses with no knowledge or reason to know of the "understatement." However, courts have previously acknowledged this point and "concluded that this deviation from plain meaning is justified because it avoids 'acceptance of an ignorance of the law defense.'" *Cheshire v. Commissioner*, 282 F.3d at 333 n.16 (quoting *Sanders v. United States*, 509 F.2d 162, 169 n.14 (5th Cir. 1975)); *Mayworm v. Commissioner*, T.C. Memo. 1987-536, 54 T.C.M. (CCH) 941, 944 (1987) (noting that the application of the knowledge-of-the-transaction test may not necessarily "square with the literal language of the statute" but that "it avoids the practical problems associated with an ignorance of the law defense"); *see also Price v. Commissioner*, 887 F.2d 959, 963 n.9

**[\*42]** *Richardson v. Commissioner*, 509 F.3d 736, 745–46 (6th Cir. 2007), *aff'g* T.C. Memo. 2006-69; *Mitchell v. Commissioner*, 292 F.3d 800, 802–03 (D.C. Cir. 2002), *aff'g* T.C. Memo. 2000-332; *Bliss v. Commissioner*, 59 F.3d 374, 378 (2d Cir. 1995), *aff'g* T.C. Memo. 1993-390; *Purcell v. Commissioner*, 826 F.2d 470, 473–74 (6th Cir. 1987), *aff'g* 86 T.C. 228 (1986); *Quinn v. Commissioner*, 524 F.2d 617, 625–26 (7th Cir. 1975), *aff'g* 62 T.C. 223 (1974); *Smith v. Commissioner*, 70 T.C. 651, 672–73 (1978); *McCoy v. Commissioner*, 57 T.C. 732, 734–35 (1972); *Becherer v. Commissioner*, T.C. Memo. 2004-282, slip op. at 5–6; *Zoglman v. Commissioner*, T.C. Memo. 2003-268, slip op. at 6–8; *Estate of Hall v. Commissioner*, T.C. Memo. 1996-93, slip op. at 14–15, *aff'd*, 103 F.3d 112 (3d Cir. 1996) (unpublished table decision); *Mayworm*, 54 T.C.M. (CCH) at 943–44.[54]  Under the knowledge-of-the-transaction test, a requesting spouse does not satisfy section 6015(b)(1)(C) if he knew or had reason to know of the transaction that gave rise to the understatement at issue.  *Jonson*, 118 T.C. at 115; *see also Erdahl v. Commissioner*, 930 F.2d 585, 589 (8th Cir. 1991), *rev'g and remanding* T.C. Memo. 1990-101; *Wang v. Commissioner*, T.C. Memo. 2014-206, at \*17.  Whether the requesting spouse understands the tax consequences of the underlying transaction is immaterial.  *See Quinn v. Commissioner*, 524 F.2d at 626 ("The knowledge contemplated by the statute is not knowledge of the tax consequences of a transaction but rather knowledge of the transaction itself."); *see also Mitchell v. Commissioner*, 292 F.3d at 803–04; *Cheshire v. Commissioner*, 282 F.3d at 334–35; *Price v. Commissioner*, 887 F.2d at 964; *Purcell*, 86 T.C. at 237–38; *Smith*, 70 T.C. at 672–73; *McCoy*, 57 T.C. at 734–35; *Pierce*

---

(9th Cir. 1989) ("[I]n income omission cases, knowledge of the transaction is virtually equivalent to knowledge of the understatement because if a spouse knows of a transaction which generated income that the return does not report, then it is extremely likely that she will know that the return does not report all income (unless she merely lacks knowledge of tax consequences).").  Moreover, for the reasons fully discussed *infra* pp. 43–50, we conclude that Dr. Strom's arguments in these cases that he neither knew nor had reason to know of the understatement on the 2000 return are fundamentally premised on an ignorance of the law defense and illustrate why such a deviation is justified.

[54] Leading treatises also support the applicability of the knowledge-of-the transaction test in cases involving omitted income.  *See* Karen B. Brown, *Innocent Spouse Relief*, 645-2nd Tax Mgmt. (BNA), at A-8 ("Regarding omissions of income, the proper inquiry is whether the spouse knew or should have known of the underlying transaction giving rise to the other spouse's omission."); Michael I. Saltzman & Leslie Book, *IRS Practice and Procedure* ¶ 7C.03[1][b][i] (rev. 2d ed. 2018) ("Knowledge of the underlying income generating transaction is sufficient to preclude relief, and it is not relevant whether the taxpayer understands the legal consequences of the transaction.").

[*43] *v. Commissioner*, T.C. Memo. 2003-188, slip op. at 25–27; *Estate of Hall*, T.C. Memo. 1996-93, slip op. at 14–15; *Bollaci v. Commissioner*, T.C. Memo. 1991-108, 61 T.C.M. (CCH) 2137, 2138–39. Consequently, where the requesting spouse has complete factual knowledge of the underlying transaction, such that his defense rests entirely upon ignorance of the law, he is deemed to have "reason to know" of the understatement as a matter of law. *Mitchell v. Commissioner*, 292 F.3d at 804 ("Ignorance of the law, standing alone, . . . is not a defense under any test."); *Cheshire v. Commissioner*, 282 F.3d at 335; *Price v. Commissioner*, 887 F.2d at 964.

Absent a stipulation to the contrary, appeal in these cases lies to the Ninth Circuit, where the knowledge-of-the-transaction test "remains appropriate when applied to income omission cases."[55]  *Guth v. Commissioner*, 897 F.2d 441, 444 (9th Cir. 1990), *aff'g* T.C. Memo. 1987-522; *see also Price v. Commissioner*, 887 F.2d at 963 n.9 ("[I]n income omission cases, knowledge of the transaction is virtually equivalent to knowledge of the understatement.").

Dr. Strom argues that he neither knew nor had reason to know of the understatement on the 2000 return.  He argues that the tax treatment of the income attributable to Mrs. Strom's InfoSpace option exercises in 2000 was a "complex issue which involve[d] many facts and

---

[55] This Court has applied the knowledge-of-the-transaction test in cases involving understatements attributable to omissions of income *and* to erroneous deductions.  *See Jonson*, 118 T.C. at 115–16; *Wang*, T.C. Memo. 2014-206, at *17. However, some courts, including the Ninth Circuit, have adopted an alternative knowledge test in cases involving understatements attributable to erroneous deductions; under this alternative knowledge test, knowledge of the transaction, while still relevant, is alone not sufficient to preclude innocent spouse relief.  *See Price v. Commissioner*, 887 F.2d 959 (9th Cir. 1989).  Despite the fact that the understatement in these cases is attributable to an omission of income, Dr. Strom argues that we should apply the alternative knowledge test followed by some courts in cases involving erroneous deductions.  We decline to do so.  *See Cheshire*, 115 T.C. at 192–93 (rejecting, in a Court-reviewed case, a similar argument with respect to the proper knowledge test under section 6015(b)(1)(C) in cases involving omissions of income).  Nevertheless, we note that the outcome would be the same in these cases under either test because we conclude that Dr. Strom knew "virtually all of the facts pertaining to the transaction[s] which underlie[] the . . . understatement." *Price v. Commissioner*, 887 F.2d at 964.  Therefore, Dr. Strom is deemed as a matter of law to have had reason to know of the understatement for purposes of section 6015(b)(1)(C).  *Price v. Commissioner*, 887 F.2d at 964; *see also Cheshire v. Commissioner*, 282 F.3d at 334–35 (finding that the result would be the same under either the knowledge-of-the-transaction test or alternative knowledge test where the taxpayer "knew all the facts surrounding the transaction that gave rise to the understatement").

[*44] circumstances as well as complex issues of law" and that these cases are unique because he "signed the returns with the good faith understanding that qualified professionals had properly resolved the complex fact and legal issues involved." He further argues that, rather than an ignorance of the law defense, the foregoing argument constitutes a reliance "upon his good faith and reasonable belief that the tax being reported was in accordance with the law, as the professionals concluded." Dr. Strom argues that he did "everything he could be expected to do to be assured that the return correctly reported Bernee's [i.e., Mrs. Strom's] stock option exercises" by attending "meetings with Bernee, KPMG representatives, Tim Austin, and Bruce Benson where the facts, circumstances, and legal issues were discussed" and that he reasonably believed the omission of over $100 million of income from the 2000 return was correct because it "comported with his knowledge that he and Bernee were not $100 million wealthier at the end of the day as a result of the stock transactions."

Among other things, respondent argues that Dr. Strom "unquestionably" had actual knowledge of Mrs. Strom's InfoSpace option exercises in 2000 that gave rise to the income omitted from the 2000 return and that he therefore is ineligible for relief under section 6015(b). We agree with respondent.

First, Dr. Strom was not only aware of Mrs. Strom's InfoSpace option exercises in 2000; he was involved in them. He has conceded that he knew Mrs. Strom was exercising InfoSpace options in 2000 and that he did not object because he trusted her judgment that the stock was a good investment. Dr. Strom has also conceded that he had opportunities to speak with Mrs. Strom about the InfoSpace option exercises but deferred to her judgment because he "felt that . . . [she] had the information base and the sophistication to be capable of making the right decision." Moreover, he signed the "Consent of Spouse" form attached to each of the three InfoSpace stock option agreements and has conceded that he read at least one of those agreements before providing his consent. Relatedly, Dr. Strom was involved in obtaining the $10 million BoA Loan that was used to fund Mrs. Strom's InfoSpace option exercises in 2000. He signed the BoA Loan Agreement, and the proceeds of the loan were deposited into a bank account held by the Stroms jointly. After Bank of America subsequently declared the Stroms in default of the BoA Loan Agreement, and the outstanding $10 million principal payment became immediately due, Dr. Strom was involved in the settlement discussions with the bank concerning repayment of the loan, including participating in a conference call

**[\*45]** regarding the matter with Mrs. Strom and their counsel on January 31, 2001, and jointly sending a letter with Mrs. Strom (bearing the same date) to the bank advising that the Stroms anticipated "a significantly reduced tax obligation" for 2000 based on the revised "calculations" of their new tax counsel.

Second, Dr. Strom participated alongside Mrs. Strom in the nearly nine-month process of engaging with the team of lawyers and tax consultants they jointly retained to gather the facts involving Mrs. Strom's InfoSpace option exercises in 2000 and to develop tax-favorable positions on the 2000 return with respect to the income attributable to those exercises. Among other things, the process of gathering the facts and developing the reporting positions on the 2000 return included at least three in-person meetings between the Stroms and their lawyers and tax consultants. Dr. Strom has conceded that he was present for these meetings. He testified: "I made it my business to go to those meetings so that I could . . . fully understand, as best it was possible for me to understand, what was going on, what the significance of it was, and so that I could do my own due diligence to understand . . . what was happening" with respect to the reporting positions being taken on the return. He further testified that the meetings were held with the Stroms' lawyers and tax consultants because he and Mrs. Strom "were seeking a sophisticated legal opinion regarding the timing of when to report those stock options on our tax returns" and that he attended the meetings "to be sure that things were being discussed and ultimately resolved by consensus to [his] satisfaction to make sure things were being properly done within [his] level of expertise." Moreover, Dr. Strom has conceded that, during the meetings, "the facts, circumstances, and legal issues" relating to the exercise of InfoSpace stock options were discussed.

During the aforementioned period Dr. Strom also participated in at least 21 conference calls with the Stroms' lawyers and tax consultants. Notably, Mrs. Strom did not participate in 7 of those 21 calls, meaning Dr. Strom was the only client on those calls.[56] Issues

---

[56] While Mrs. Strom did not challenge the fact that Dr. Strom was present for these calls, she testified that he was "not participating." Mrs. Strom testified that Dr. Strom's behavior was "erratic" and "irritable" during 2000 and 2001 and that she had concerns about his well-being and the drugs he was taking at that time. She further testified: "Mark [Dr. Strom] . . . wasn't very functional then. He probably—we wanted to save face. He wanted to be there, but he couldn't participate. And he didn't participate." She testified: "He was trying to appear competent. I can assure you we—

**[*46]** discussed during the calls included the Stroms' 2000 tax liability, the reporting positions on the 2000 return with respect to Mrs. Strom's exercise of InfoSpace stock options in that year, and the Disclosure Statement attached thereto. Additionally, Dr. Strom, but not Mrs. Strom, participated in a conference call in March 2001 with various KPMG professionals and other KPMG clients regarding possible changes to the federal income tax laws as they relate to the exercise of stock options in a falling market.

Third, Dr. Strom approved the reporting positions on the 2000 return with respect to the income attributable to Mrs. Strom's InfoSpace option exercises. Dr. Strom has conceded that at the time the 2000 return was filed, he was aware that there was a discrepancy between the amount of income reported by the Stroms with respect to Mrs.

---

it was the appearance of being involved, but [Dr. Strom] truly wasn't involved and not capable of being involved."

With respect to his drug intake during 2000 and 2001, Dr. Strom testified that he was taking prescription drugs and simultaneously abusing narcotics and that as a result he was "confused, had difficulty focusing, . . . had difficulty thinking clearly, . . . had a lot of amnesia, . . . had difficulty remembering, and . . . just couldn't function."

On the record before us, we do not find that Dr. Strom's participation in the nearly nine-month process in question (including his participation in the conference calls discussed above) was meaningfully diminished by a lack of competence or capacity. First, as noted above, Mrs. Strom was not present for 7 of the 21 conference calls in which Dr. Strom participated during the period, meaning that Dr. Strom was the only client on the call. Given the ethical obligations of the Stroms' lawyers and tax consultants, we find it implausible that they would have conducted those conference calls with an incompetent or incapacitated client. Second, Mr. Lintermans testified that he did not observe "anything unusual" about Dr. Strom's behavior during the in-person meeting on June 13, 2001, and Ms. Swartz testified that she never questioned Dr. Strom's capacity or his authority to speak on behalf of himself or Mrs. Strom. Third, the record corroborates the testimony of Mr. Lintermans and Ms. Swartz insofar as it includes at least one noteworthy example of Dr. Strom's issuing a directive to Ms. Swartz that she timely followed. On the morning of August 13, 2001, Dr. Strom sent an email to the Stroms' lawyers and tax consultants, including Ms. Swartz, wherein he (1) approved the Disclosure Statement on behalf of himself, Mrs. Strom, and Ms. Brenner and (2) directed Ms. Swartz to prepare an extension request to October 15, 2001, for the filing of the 2000 return. Later that same morning, Ms. Swartz replied to Dr. Strom's email, advising him that she had filed the extension request as he requested. If Dr. Strom had previously presented as incompetent or incapacitated during any of the three in-person meetings that preceded the issuance of the foregoing directive, we find it implausible that Ms. Swartz would have timely responded as she did. Fourth, at trial Dr. Strom testified that a professional biography describing him as having published at least two articles in 2000 was accurate and that at the time he was functioning at a level allowing him to write and publish the articles. We find this level of functioning to be inconsistent with the contention that Dr. Strom was unable to attend to his federal income tax obligations during the relevant period.

[*47] Strom's InfoSpace option exercises in 2000 and the amount of income reported by InfoSpace on the Forms W–2 issued to her for that year.

Moreover, Dr. Strom has conceded that he reviewed the Stroms' 2000 return, including the Form W–2 information attached thereto, before signing it,[57] that the Stroms were given a choice of how to report the income attributable to Mrs. Strom's InfoSpace option exercises, and that "Bernee and . . . [he] decided to follow the advice of the consultants that were called." Dr. Strom testified that when he and Mrs. Strom made the choices on the 2000 return with respect to reporting positions, they did so together as a team. Ms. Swartz confirmed this fact, testifying that the Stroms, after consulting with their legal counsel, ultimately chose the reporting positions on the 2000 return with respect to the income attributable to Mrs. Strom's InfoSpace option exercises in that year.

Dr. Strom has also conceded that, before the filing of the Stroms' 2000 return, he read and approved the Form 8275 and the Disclosure Statement attached thereto. The Form 8275 stated that the Stroms

---

[57] At trial Dr. Strom conceded that his claim on the Second Form 8857 that he did not review the 2000 return before filing it was not accurate. He testified that he could not explain the discrepancy. On brief, Dr. Strom attempts to minimize the significance of his concession that he reviewed the Stroms' 2000 return before signing it by citing the following testimony regarding his method of review: "I—these returns were hundreds and hundreds of pages long, and had been put together with the advice of these experts in the field. So in view of that, my policy was to flip through the first few pages of the return and then go ahead and sign them." Dr. Strom also cites his testimony that the "huge figures" on the Forms W–2 issued to Mrs. Strom by InfoSpace "were meaningless" to him and that he did not understand them.

We are not persuaded that the foregoing testimony lessens the impact of Dr. Strom's concessions. First, when asked at trial to explain his understanding of the significance of a Form W–2, Dr. Strom testified that a Form W–2 "[i]ndicates income." Second, it is well established that section 6015 does not protect a requesting spouse who turns a blind eye to facts readily available to him on the return. *Porter*, 132 T.C. at 212. The significance of his concession lies in the fact that he was presented with the opportunity to review the 2000 return and thereafter chose to sign it. Having signed the 2000 return under penalty of perjury, Dr. Strom is charged with knowledge of its contents. *See Hayman v. Commissioner*, 992 F.2d 1256, 1261–62 (2d Cir. 1993), *aff'g* T.C. Memo. 1992-228. To that point, we would additionally note that when asked at trial to explain his understanding of the significance of signing a legal document, Dr. Strom testified: "To indicate that to a person's satisfaction things on the document are as they should be."

[*48] were not reporting $100,535,827[58] of the $106,526,884.44 of Form W–2 income reported by InfoSpace for Mrs. Strom for 2000. Moreover, the Disclosure Statement reported that the omitted income was attributable to Mrs. Strom's InfoSpace options exercises in 2000 and asserted that the Stroms were entitled to defer calculation and recognition of the gain associated with the exercises until 2001 when, in their view, certain transfer restrictions and forfeiture risks with respect to the shares lapsed. Thus, the facts pertaining to the underlying transactions that gave rise to the understatement on the 2000 return were set forth in the Disclosure Statement. Consequently, Dr. Strom's concession that he read and approved the Disclosure Statement is also a concession that, at the time the 2000 return was filed, he had actual knowledge of the facts pertaining to the underlying transactions that gave rise to the understatement at issue.

Additionally, Dr. Strom has conceded that he received a letter from Ms. Swartz of KPMG regarding the risks associated with the reporting positions with respect to the income attributable to Mrs. Strom's InfoSpace option exercises.[59] By letter dated October 12, 2001, and addressed to Mr. Cowan, Dr. Strom, and Mrs. Strom, Ms. Swartz of KPMG not only summarized the facts, circumstances, and legal issues pertaining to the reporting positions, but also warned of the risks associated with adopting them. The letter advised that, while KPMG had concluded that there was a "reasonable basis" for the positions, this standard did not reflect an expectation of success if the positions were challenged by the IRS. Moreover, the letter warned that, because of the "magnitude of the income and tax involved," and the fact that the reporting positions were inconsistent with the reporting of InfoSpace on the Forms W–2 issued to Mrs. Strom, KPMG expected the Stroms' 2000 return to be audited and the positions to be challenged. The letter further warned that, with respect to the IRS challenge that would likely

---

[58] As previously noted, the parties have agreed that the correct amount of the Stroms' unreported income for 2000 is $100,535,826.

[59] During his deposition, when asked whether he recalled Ms. Swartz's writing a letter to the Stroms regarding the risks involved with the reporting positions on the 2000 return, Dr. Strom testified: "I do remember that letter." However, at trial, when asked the same question, Dr. Strom testified: "No." In view of Dr. Strom's inconsistent testimony, respondent's counsel moved to admit into evidence the transcript of Dr. Strom's deposition testimony for purposes of prior inconsistent statements and party admissions. Petitioners' counsel, who was present during the deposition, represented that petitioners had no objection to the admission of the deposition transcript for the foregoing purposes. Accordingly, the deposition transcript has been admitted into evidence under the agreed-to conditions.

**[\*49]** ensue, the Stroms "should be prepared for a protracted process" that would require resources and could ultimately put them "in a less favorable position than had the positions not been claimed (other than from the standpoint of the timing of the tax payments)." The foregoing letter followed the issuance of a letter dated June 8, 2001, and addressed to Mr. Cowan, Dr. Strom, and Mrs. Strom, wherein Ms. Swartz similarly summarized the facts, circumstances, and legal issues pertaining to the reporting positions and advised the Stroms that KPMG had concluded that the positions were "not frivolous." The letter dated June 8, 2001, included a warning substantially similar to that discussed above with respect to the likelihood that the reporting positions would be challenged by the IRS. While the record is unclear as to which of these two letters Dr. Strom's concession is directed to, both letters summarized the facts, circumstances, and legal issues relating to the reporting positions and warned that the positions were likely to be challenged by the IRS.

Although Dr. Strom insists that he is not relying on an ignorance of law defense, we disagree. Dr. Strom argues that he did not know or have reason to know of the understatement because the tax treatment of the income attributable to Mrs. Strom's InfoSpace option exercises was complex and that he therefore relied on a team of lawyers and tax consultants to determine the reporting positions on the 2000 return, which he believed were correct at the time the return was filed. Despite his claims to the contrary, this is fundamentally an argument that his lack of knowledge of the tax consequences of Mrs. Strom's exercise of her InfoSpace stock options in 2000 establishes that he did know or have reason to know of the understatement. "[I]gnorance of the attendant legal or tax consequences of an item which gives rise to a deficiency is no defense for one seeking to obtain innocent spouse relief." *Price v. Commissioner*, 887 F.2d at 964; *see also Mitchell v. Commissioner*, 292 F.3d at 803–04; *Cheshire v. Commissioner*, 282 F.3d at 334–35. This is true even where, as here, the gain was merely "on paper" and was not realized in cash or some other tangible form. *See McCoy*, 57 T.C. at 734 (rejecting the taxpayers' argument "that since as laymen they were naturally unaware of the tax consequences of incorporating the deficit partnership and since they did not realize the resulting gain in cash or other tangible form, neither husband nor wife should be held liable"); *see also Smith*, 70 T.C. at 672–73 (holding that the requesting spouse was ineligible for relief from a joint tax liability arising from constructive dividend income omitted from the return where she "had a sufficient familiarity with the facts surrounding the [stock] redemptions to be charged with knowledge of the transactions which caused the

**[\*50]** omissions"); Treas. Reg. § 1.6015-3(c)(2)(i)(A) (providing that, in cases involving omissions of income, actual knowledge of the understatement includes knowledge of the receipt of the income, even where there is no actual receipt of cash, e.g., a dividend reinvestment or a distributive share from flowthrough entities).[60] We are therefore unpersuaded by Dr. Strom's argument that he neither knew nor had reason to know of the understatement on the Stroms' 2000 return.

In view of the foregoing, and on the basis of the entire record, we find, and so hold, that Dr. Strom had actual knowledge of Mrs. Strom's InfoSpace stock option exercises in 2000. Accordingly, he does not satisfy section 6015(b)(1)(C) and is not entitled to relief under section 6015(b). *See Cheshire*, 115 T.C. at 192–93; *Mitchell*, T.C. Memo. 2000-332, slip op. at 8–10. On the basis of the entire record, we also find, and so hold, that Dr. Strom knew "virtually all of the facts pertaining to the transaction[s] which underlie[] the . . . understatement, [such that his] defense . . . is premised solely on ignorance of law." *See Price v. Commissioner*, 887 F.2d at 964. Accordingly, Dr. Strom also had "reason to know" of the understatement as a matter of law and is not entitled to relief under section 6015(b). *See Mitchell v. Commissioner*, 292 F.3d at 803–04; *Cheshire v. Commissioner*, 282 F.3d at 334–35; *Price v. Commissioner*, 887 F.2d at 964.

B.    *Section 6015(b)(1)(D)*

The requirements of section 6015(b)(1) are stated in the conjunctive; consequently, Dr. Strom's knowledge of the understatement on the 2000 return alone is fatal to his claim for relief under section 6015(b). *See Alt*, 119 T.C. at 313. However, we also conclude, after considering all of the facts and circumstances, that it would not be inequitable to hold Dr. Strom liable for the deficiency attributable to the understatement on the Stroms' 2000 return, and we therefore additionally discuss the application of section 6015(b)(1)(D). *See Jonson*, 118 T.C. at 119.

Section 6015(b)(1)(D) provides that in order for a requesting spouse to obtain relief, it must be inequitable to hold him liable for the

---

[60] Treasury Regulation § 1.6015-2(c) provides that the rules relating to a requesting spouse's actual knowledge are set forth in Treasury Regulation § 1.6015-3(c)(2). *See Wilson v. Commissioner*, T.C. Memo. 2017-63, at \*7–8 (applying Treasury Regulation § 1.6015-3(c)(2) in tandem with the knowledge-of-the-transaction test in determining requesting spouse's entitlement to relief under section 6015(b) in a case involving an omission of income).

[*51] deficiency in tax attributable to the understatement on the joint return. "All of the facts and circumstances are considered in determining whether it is inequitable to hold a requesting spouse jointly and severally liable for an understatement." Treas. Reg. § 1.6015-2(d). The regulations specifically identify several relevant factors: (1) whether the requesting spouse significantly benefited, directly or indirectly, from the understatement; (2) whether the requesting spouse has been deserted by the nonrequesting spouse; (3) whether the spouses have been divorced or separated; and (4) whether the requesting spouse received a benefit on the return from the understatement. *Id.*

Additionally, the regulations provide that the criteria used in determining whether the requesting spouse is entitled to equitable relief under section 6015(f) are also considered in the context of section 6015(b)(1)(D). Treas. Reg. § 1.6015-2(d). Rev. Proc. 2013-34, § 4.03(2), 2013-43 I.R.B. 397, 400–03,[61] sets forth a list of nonexclusive factors that may be considered in determining a requesting spouse's eligibility for equitable relief under section 6015(f): (1) whether the spouses are separated, divorced, or living apart; (2) whether the requesting spouse would suffer economic hardship if relief were not granted; (3) whether the requesting spouse knew or had reason to know of the understatement; (4) whether the requesting spouse or the nonrequesting spouse has a legal obligation to pay the outstanding federal income tax liability; (5) whether the requesting spouse received a significant benefit from the understatement; (6) whether the requesting spouse has made a good faith effort to comply with the income tax laws following the taxable years for which relief is sought; and (7) whether the requesting spouse was in poor mental or physical health at the time he signed the joint return or requested relief.

The material factors most often cited and considered by this Court in determining whether it would be inequitable to hold the requesting spouse liable for the deficiency attributable to the understatement are: (1) whether there has been a significant benefit to the requesting spouse and (2) whether the failure to report the correct tax liability on the joint return resulted from concealment, overreaching, or any other wrongdoing on the part of the other spouse. *Alt*, 119 T.C. at 314; *Jonson*,

---

[61] Rev. Proc. 2013-34, which modifies and supersedes Rev. Proc. 2003-61, 2003-2 C.B. 296, which in turn supersedes Rev. Proc. 2000-15, 2001-1 C.B. 447, applies to requests for equitable relief under section 6015(f) that were filed on or after September 16, 2013, or, as is the case here, that were pending in a case docketed with a federal court on that date. Rev. Proc. 2013-34, § 7, 2013-43 I.R.B. at 403.

**[*52]** 118 T.C. at 119. We therefore begin our analysis by discussing the application of these two factors.

## 1. *Significant Benefit*

A significant benefit is any benefit in excess of normal support. Treas. Reg. § 1.6015-2(d); *see also* Rev. Proc. 2013-34, § 4.03(2)(e), 2013-43 I.R.B. at 402. Normal support is measured by the circumstances of the particular parties. *See Estate of Krock v. Commissioner*, 93 T.C. 672, 678–79 (1989). However, even where the requesting spouse's standard of living remains constant, a significant benefit may still be found if the tax savings are "immensely beneficial." *Jonson*, 118 T.C. at 119–20. The requesting spouse bears the burden of proving that he received no benefit from the understatement in excess of normal support, and this burden must be satisfied with specific facts regarding lifestyle, expenditures, asset acquisitions, and the disposition of the benefits of the understatement. *See Estate of Krock*, 93 T.C. at 681.

Where an understatement on the joint return results in an improper refund of a relatively substantial amount, as it did here,[62] we have held that the requesting spouse may in some cases receive a significant benefit in terms of increased cashflow. *See Abelein v. Commissioner*, T.C. Memo. 2004-274, slip op. at 41–42; *Capehart v. Commissioner*, T.C. Memo. 2004-268, slip op. at 45–46, *aff'd*, 204 F. App'x 618 (9th Cir. 2006); *Doyle*, T.C. Memo. 2003-96, slip op. at 14–15, 15 n.13; *see also Conrad v. Commissioner*, T.C. Memo. 2017-116, at *12–13; *Work v. Commissioner*, T.C. Memo. 2014-190, at *28; *Smith v. Commissioner*, T.C. Memo. 2009-237, slip op. at 13–14; *French v. Commissioner*, T.C. Memo. 1996-38, slip op. at 8–11. For the reasons that follow, we find that this is such a case and, more specifically, that Dr. Strom significantly benefited from the understatement in that (1) $9,263,489.59 of the $15,033,879 improper refund claimed on the 2000 return was paid to Bank of America to satisfy in full the outstanding balance of the $10 million BoA Loan for which Dr. Strom was personally liable, thereby relieving him of a substantial personal debt obligation and avoiding any potential collection action by Bank of America; and (2) the majority of the remaining $5,770,389.41, after being subject to a series of transfers among accounts jointly controlled by Dr. and Mrs. Strom, was invested in Belle Point Ltd., the offshore

---

[62] The Stroms reported a $17,033,879 overpayment on the 2000 return and together chose to claim a $15,033,879 refund and to elect to have $2 million applied to their estimated income tax for 2001.

[*53] company indirectly owned by the Stroms and formed in part for the purpose of making their assets more difficult to seize by potential creditors.

### a.      *Satisfaction of the $10 Million BoA Loan*

At the time he signed the 2000 return, Dr. Strom was aware of the outstanding $10 million BoA Loan.  He was involved in obtaining the loan, having signed the BoA Loan Agreement and amendments thereto, and, following the Stroms' default under the agreement, he was involved in discussions with Bank of America concerning the terms of a settlement agreement, including advising the bank of details regarding the Stroms' federal income tax liability for 2000.

By letter dated January 31, 2001, the Stroms advised Bank of America that they had engaged new tax counsel to review their 2000 federal income tax liability and that, on the basis of that review, they anticipated a "significantly reduced tax obligation" for the year.  In support of this claim, the Stroms attached a financial statement listing an $8.4 million decrease to the amount of the 2000 federal income liability that they had listed in the previously provided financial statement.  By the letter the Stroms sought to leverage favorable settlement terms on the basis of what they described as a "tax correction" for 2000.

The surrounding circumstances make it clear that the understatement on the 2000 return and the terms of the Stroms' settlement with Bank of America were inextricably intertwined.

Under the terms of the Resolution Agreement with Bank of America, the Stroms agreed, inter alia (1) to execute a deed of trust on their Kirkland condominium and a mortgage on their Iowa farm; (2) to assign their 2000 refund to Bank of America; (3) to direct that the refund be deposited in the client trust account of their attorney; (4) to file the 2000 return no later than October 15, 2001; and (5) to provide Bank of America with a full and complete copy of the 2000 return within five days of filing it.  We find the term requiring the execution of a deed of trust on the Stroms' Kirkland condominium and a mortgage on the Iowa farm to be particularly noteworthy in that it imposed material consequences on the Stroms if they failed to repay the $10 million BoA Loan under the terms of the Resolution Agreement.  Moreover, the terms of the Resolution Agreement required the Stroms to acknowledge and represent to Bank of America that, as trustees and beneficiaries of

**[\*54]** the Strom Family Trust, they would "benefit individually" as a result of entering into the Resolution Agreement, the Assignment of IRS Refunds, and Amendment No. 4. Dr. Strom's acknowledgment and representation to Bank of America that he received an individual benefit by virtue of having assigned the Stroms' 2000 refund to Bank of America, in furtherance of settling the outstanding $10 million BoA Loan for which he was personally liable, is a party admission by Dr. Strom that the understatement on the 2000 return improved his financial position when the return was filed.

To the extent Dr. Strom argues that the $15,033,879 refund did not result in a net benefit and merely restored the Stroms to the position they would have held if they had not borrowed $20 million to exercise the InfoSpace stock options, we are unpersuaded. In determining whether it is inequitable to hold the requesting spouse liable for the deficiency attributable to an understatement, "the relevant inquiry is whether the requesting spouse received significant benefit, not whether she ultimately received a net benefit." *Haggerty v. Commissioner*, 505 F. App'x 335, 340–41 (5th Cir. 2013) (finding that the requesting spouse received a significant benefit where the omitted income was used to pay off a lien on her residence, thereby absolving her of any personal liability), *aff'g* T.C. Memo. 2011-284. Thus, the relevant inquiry here is not whether Dr. Strom ultimately received a net benefit but rather whether he received a significant benefit.

Even if the inquiry were whether Dr. Strom received a net benefit, his claim that he did not receive such a benefit from the repayment of the $10 million BoA Loan is not supported by the record. We note, for example, that the Stroms' Statement of Assets and Liabilities as of January 31, 2001, lists the Stroms' total assets as $50,642,204.83 and total liabilities as $38,938,847.47, for a net worth of $11,703,357.36. The $10 million BoA Loan is listed on that document under the Stroms' liabilities; conversely, the $15,033,879 refund is not listed under the Stroms' assets (as it had not been issued to them yet). Consequently, the removal of the $10 million BoA Loan from the liabilities side of the ledger alone would have nearly doubled the Stroms' net worth by increasing it to $21,703,357.36.[63]

---

[63] In a similar respect, we note that the Stroms' Statement of Assets and Liabilities as of January 31, 2001, lists a 2000 income tax liability balance due of $20 million. However, it reduces that amount by $9 million to account for the alternative reporting position that the Stroms were planning to adopt on the 2000

**[\*55]** In view of the foregoing and after considering all of the facts and circumstances, we find that the use of over $9.26 million of the $15,033,879 refund to satisfy the outstanding balance of the $10 million BoA Loan provided Dr. Strom with a significant benefit. *See Schlosser v. Commissioner*, T.C. Memo. 1992-233, 63 T.C.M. (CCH) 2807, 2809–10 (finding that the requesting spouse significantly benefited where the proceeds of improper refunds were used to pay debts for which she was personally liable), *aff'd*, 2 F.3d 404 (11th Cir. 1993) (unpublished table decision); *see also Haggerty v. Commissioner*, 505 F. App'x at 340–41; *Smith*, 70 T.C. at 673 (finding that the requesting spouse significantly benefited from constructive dividend income omitted from the joint return because the corporation's satisfaction of nonrequesting spouse's personal obligation prevented a potentially "tremendous" financial burden on the household); *Dosek v. Commissioner*, T.C. Memo. 1971-160, 30 T.C.M. (CCH) 688, 690–91 (finding that the requesting spouse significantly benefited from discharge of indebtedness income omitted from the joint return where she was liable in her individual capacity for the indebtedness and, following the execution of the agreement discharging the debt, her liability ceased).

      b.      *Remaining $5,770,389.41 of the $15,033,879 Refund*

At trial both Dr. and Mrs. Strom claimed no recall concerning the disposition of the $5,770,389.41 balance of the $15,033,879 improper refund remaining after satisfaction of the $10 million BoA Loan. Nevertheless, thousands of pages of financial records are in evidence, and those records have enabled the Court to trace the $5,770,389.41 from their attorney's client trust account to (and through) various

---

return with respect to the income arising from the exercise of the InfoSpace stock options. Yet, even accounting for that discount, the document still indicates that the understatement on the 2000 return removed at least an additional $11 million from the liabilities side of the ledger, thereby further increasing the Stroms' net worth to over $32.7 million. In view of the foregoing, and considering all of the facts and circumstances, we find that, even if the Stroms' lifestyle remained the same after the understatement (something that Dr. Strom contends but fails to carry his burden to prove with specific facts regarding lifestyle, expenditures, asset acquisitions, and the disposition of the benefits of the understatement), the tax savings generated by that understatement were "immensely beneficial" to him. *See Jonson*, 118 T.C. at 19–20; *see also Edmonson v. Commissioner*, T.C. Memo. 1996-393, slip op. at 14–15 (noting that the taxpayers' standard of living did not increase but they continued living together for four years following the year at issue and "shared equally in the tax savings generated by the understatement").

**[*56]** accounts jointly controlled by Dr. and Mrs. Strom during the relevant period.[64]

On November 7, 2001, pursuant to the Stroms' instructions on the 2000 return, the $15,033,879 improper refund was wired to their attorney's client trust account. On the same date, two checks were drawn on the client trust account: (1) a check for $9,263,489.59, issued to Bank of America in satisfaction of the Stroms' outstanding $10 million BoA Loan and (2) a check for $5,770,389.41. Also on the same date, the Strom Family Trust 5308 Account jointly controlled by Dr. and Mrs. Strom received an incoming wire transfer from U.S. Bank (where the client trust account was located) of $5,770,389.41. Two days later, that same amount (i.e., $5,770,389.41), was wired to the Strom Family Trust 4268 Account also jointly controlled by Dr. and Mrs. Strom.

In the light of the timing and amounts of the foregoing transactions, we find that the $5,770,389.41 check drawn on the client trust account on November 7, 2001, was issued to the Stroms and that they initially deposited the amount in the Strom Family Trust 5308 Account before directing a transfer of the same amount two days later to the Strom Family Trust 4268 Account. Dr. Strom has conceded that he and Mrs. Strom had a choice of where to send the $15,033,879 improper refund and that, after discussing the matter, they made the choice together to send the refund to their attorney's client trust account in accordance with the Resolution Agreement and Assignment of IRS Refunds. We believe that the foregoing concession gives rise to a reasonable inference, which we make here, that Dr. and Mrs. Strom also had a choice of where to send the $5,770,389.41 check drawn on the client trust account on November 7, 2001, and that, upon receipt thereof, they made the choice together to deposit it in the Strom Family Trust 5308 Account (and thereafter to transfer it to the Strom Family Trust 4268 Account).

Under the terms of the Resolution Agreement between the Stroms and Bank of America, Dr. Strom was required to acknowledge and represent to the bank that, as a trustee and beneficiary of the Strom Family Trust, he would "benefit individually" as a result of entering into the Resolution Agreement, the Assignment of IRS Refunds, and

---

[64] We initially discuss only two of these accounts for purposes of our holding that Dr. Strom has failed to carry his burden to prove that he did not receive a significant benefit from the $5,770,389.41 in question. However, our discussion continues by further tracing those funds through various other accounts jointly controlled by Dr. and Mrs. Strom during the relevant period.

[*57] Amendment No. 4. As noted, Dr. Strom's acknowledgment and representation is a party admission that the understatement on the 2000 return improved his financial position at the time the return was filed. It follows that if, as a trustee and beneficiary of the Strom Family Trust, Dr. Strom would "benefit individually" by assigning the Stroms' 2000 refund to Bank of America in furtherance of settling the $10 million BoA Loan for which he was personally liable, he would "benefit individually" by depositing the amount of the refund remaining after satisfaction of that loan (i.e., $5,770,389.41) into a Strom Family Trust account that he and Mrs. Strom jointly controlled as trustees. Accordingly, we find that Dr. Strom benefited individually by virtue of the deposit (and subsequent transfer) of the remaining $5,770,389.41 of the $15,033,879 improper refund into the Strom Family Trust accounts.

In view of the foregoing, and the Stroms' failure to account for the disposition of the remaining $5,770,389.41 of the improper refund, we hold that Dr. Strom has failed to carry his burden to prove that he did not receive a benefit beyond normal support with respect to that full amount. *See Estate of Krock*, 93 T.C. at 681; *see also Work*, T.C. Memo. 2014-190 (finding that the requesting spouse received an indirect significant benefit where the proceeds from the improper refund were deposited into a joint checking account); *French*, T.C. Memo. 1996-38, slip op. at 10 (rejecting the taxpayer's argument that $150,000 in certificates of deposit sourced to the understatement "merely amounted to normal support" where the taxpayer could not account for how it was spent); *Buchine v. Commissioner*, T.C. Memo. 1992-36 (rejecting the taxpayer's argument that she received only normal support where the proceeds from the improper refunds were deposited into a joint checking account, and she failed to provide any objective evidence or trace the benefit received), *aff'd*, 20 F.3d 173 (5th Cir. 1994).

Although our analysis could end there, a further parsing of the Stroms' financial records from the relevant period confirms that Dr. Strom did in fact significantly benefit from the $5,770,389.41 in question by virtue of, among other things, substantial overseas investments made on his behalf. The Stroms initially transferred the full $5,770,389.41 from the Strom Family Trust 5308 Account to the Strom Family Trust 4268 Account. The record further establishes that, on December 3, 2001, the Stroms transferred $4,970,389 of that amount from the Strom Family Trust 4268 Account back to the Strom Family Trust 5308 Account (i.e., where the $5,770,389.41 balance of the improper refund was initially deposited on November 7, 2021). On the next day, December 4, 2001, the Stroms transferred that same amount (i.e.,

**[\*58]** $4,970,389) from the Strom Family Trust 4268 Account to their jointly controlled Sugar Creek 0264 Account.[65] The Stroms left those funds in the Sugar Creek 0264 Account through the end of December 2001 and most of January 2002.

However, between January 28 and April 16, 2002, the Stroms transferred a total of $1,787,840.97 from the Sugar Creek 0264 Account to (and through) other bank accounts under their joint control during the relevant period. When coupled with certain other transfers from the Strom Family Trust 4268 Account, these transfers resulted in the total transfer of $1,311,600 to the Strom Family Trust 0144 Account and $825,000 to the Strom Family Trust 7623 Account during the aforementioned nearly three-month period. As discussed in detail *supra* notes 32 and 33, all of the funds involved in these transfers can be traced to the improper refund claimed on the 2000 return.

Thereafter, on April 25, 2002, the Stroms transferred $3,186,600—that is, approximately the amount of the improper refund then remaining in the Sugar Creek 0264 Account after accounting for the just-described transfers, plus interest—to the Sugar Creek 8814 Account. On April 29, 2002, the Stroms transferred $3,186,000 from the Sugar Creek 8814 Account to the client trust account of Mr. Ziskin. At the Stroms' direction and on their behalf, on April 30, 2002, Mr. Ziskin transferred $3,486,600[66] from his client trust account to the Belle

---

[65] The foregoing transfer of $4,970,389 from the Strom Family Trust 5308 Account to the Sugar Creek 0264 Account was made pursuant to the Joint Comprehensive Transfer Document executed by Dr. and Mrs. Strom on November 30, 2001. Dr. and Mrs. Strom each executed that instrument in their capacity as individuals and as trustees of the Strom Family Trust of 1982 and as trustees of the Carillon Management Trust (i.e., the then general partner of Sugar Creek LP). By the instrument, Dr. and Mrs. Strom together transferred total assets with an estimated fair market value of $12,735,000, and in exchange, each received a near 50% limited partnership interest. Thus, the transfer of $4,970,389 from the Strom Family Trust to Sugar Creek LP—an amount that can be traced directly to the $15,033,879 improper refund claimed on the 2000 return—constituted nearly 40% of the total asset value transferred under the instrument. Sugar Creek LP was formed as part of the Stroms' estate planning and asset protection engagement of Mr. Ziskin. Indeed, the Limited Partnership Agreement of Sugar Creek LP states that the entity was organized in part to provide asset protection for partners and "may protect the family resource base from claims of future creditors of Partners by making Partner's interests herein unattractive to creditors."

[66] Before the above-described transfer on April 29, 2002, the Stroms had made a previous transfer to the client trust account of Mr. Ziskin, which appears to have been the source of the additional $300,600. We need not discuss that transfer further here, as tracing reveals no apparent relation to the improper refund.

**[\*59]** Point Ltd. 0255 Account. As noted, Belle Point Ltd. was a Saint Lucia IBC indirectly owned by the Stroms and formed for the purpose of holding and managing the investment assets of the Sugar Creek LP in offshore accounts without raising U.S. securities law concerns for the investment managers. Moreover, Belle Point Ltd. was formed for the purpose of protecting the Stroms' assets. Thus, over half of the remaining $5,770,389.41 of the improper refund was invested in an offshore company formed in part for the purpose of making the Stroms' assets more difficult for potential creditors to seize. This fact gives rise to a reasonable inference, which we make, that the Stroms chose to transfer those improper refund proceeds to Belle Point Ltd., at least in part in an attempt to place them beyond the reach of potential creditors.

A significant benefit need not be present consumption and may instead include acquiring savings or other investment assets. *See Purificato v. Commissioner*, 9 F.3d 290, 294 (3d Cir. 1993), *aff'g* T.C. Memo. 1992-580. After considering all of the facts and circumstances, including the fact that most of the proceeds were invested in Belle Point Ltd., at least in part in an attempt to place those proceeds beyond the reach of potential creditors, we find that Dr. Strom received an additional significant benefit from the remaining $5,770,389.41 of the improper refund.[67]

c.       *Conclusion*

For the foregoing reasons, and after considering all the facts and circumstances, we conclude that Dr. Strom significantly benefited from

---

[67] We note that, in view of the size of the total transfers to the Strom Family Trust 0144 Account and the Strom Family Trust 7623 Account, *see supra* notes 32 and 33, the fact that Dr. Strom jointly controlled those two accounts with Mrs. Strom during the relevant period, and the Stroms' failure to account for the ultimate disposition of the transferred amounts, we find, after considering all of the facts and circumstances, that those amounts, too, provided him with a significant benefit.

Additionally, we note that, although on this record the Court has been unable to trace the subsequent disposition of approximately $447,789 of the refund (it was included in the initial transfer on November 9, 2001, of $5,770,389.41 from the Strom Family Trust 5308 Account to the Strom Family Trust 4268 Account, but appears to have been transferred out of the latter account at some point before December 31, 2001), that amount was part of the $5,770,389.41 remaining of the improper refund after satisfaction of the $10 million BoA Loan. It is therefore covered by our holding *supra* p. 57 with respect to Dr. Strom's failure to carry his burden to prove that he did not receive a benefit beyond normal support from that amount.

**[\*60]** the understatement of tax on the 2000 return. Accordingly, this factor weighs against relief.

### 2. *Concealment, Overreaching, or Other Wrongdoing*

"The purpose of the innocent spouse rule is to protect one spouse from the overreaching or dishonesty of the other." *Purcell v. Commissioner*, 826 F.2d at 475; *see also Becherer*, T.C. Memo. 2004-282, slip op. at 7; *Bartak v. Commissioner*, T.C. Memo. 2004-83, slip op. at 34, *aff'd*, 158 F. App'x 43 (9th Cir. 2005). It is thus well established that where, as here, "the understatement results from 'a misapprehension of the income tax laws by the preparers of the tax returns and the signatory parties,' both husband and wife are perceived to be 'innocent,' and there is 'no inequity in holding them both to joint and separate liability.'" *Hayman v. Commissioner*, 992 F.2d at 1262 (quoting *McCoy*, 57 T.C. at 735); *see also Zoglman*, T.C. Memo. 2003-268, slip op. at 9–10 (finding no inequity where the understatement was attributable to the taxpayers' reliance on the tax return preparer's incorrect determination that certain Social Security benefits were not taxable income); *Pierce*, T.C. Memo. 2003-188, slip op. at 25 (finding no inequity where taxpayers "relied on their accountants to properly assess the validity of the NOL deductions that were ultimately disallowed" and the requesting spouse "was fully aware of the facts underlying the transactions"); *Estate of Hall*, T.C. Memo. 1996-93, slip op. at 16–17 (finding no inequity where both taxpayers were aware of a pension distribution omitted from income on the joint return, they both relied on professional advice in filing the return, and neither was aware of the correct tax consequences flowing from the distribution).

The failure of the Stroms to report the correct tax liability on the 2000 return did not result from concealment, overreaching, or any other wrongdoing on the part of Mrs. Strom. Rather, Dr. Strom was involved in Mrs. Strom's InfoSpace option exercises in 2000; participated alongside her in the nearly nine-month process of engaging with their team of lawyers and tax consultants to gather the facts involving those exercises and to develop the tax-favorable positions on the 2000 return with respect to the income attributable thereto; and approved the reporting positions on the 2000 return with respect to that income. Accordingly, as the understatement was not attributable to any "dishonesty or concealment" on Mrs. Strom's part, "or to anything other than a misapprehension of the income tax laws by the preparer of the tax return and the signatories," it is not inequitable to hold the Stroms

[*61] jointly liable, and this factor weighs against relief. *Hayman v. Commissioner*, 992 F.2d at 1262–63.

### 3. *Marital Status*

If the requesting spouse is still married to the nonrequesting spouse, this factor is neutral. Rev. Proc. 2013-34, § 4.03(2)(a), 2013-43 I.R.B. at 400. Dr. and Mrs. Strom were still married and residing together at the time of trial. Accordingly, this factor is neutral.

### 4. *Economic Hardship*

Under Rev. Proc. 2013-34, § 4.03(2)(b), 2013-43 I.R.B. at 401, an economic hardship exists if the satisfaction of the tax liability in whole or in part will cause the requesting spouse to be unable to pay reasonable basic living expenses. *See Karam v. Commissioner*, 504 F. App'x 416, 421 (6th Cir. 2012) ("Economic hardship exists only where a taxpayer is unable to pay federal tax liabilities 'in whole or in part,' meaning that a taxpayer who can pay *any* portion of her liabilities after paying for reasonable basic living expenses, cannot satisfy this factor."), *aff'g* T.C. Memo. 2011-230; *see also* Treas. Reg. § 301.6343-1(b)(4) (providing that reasonable basic living expenses will vary according to the "unique circumstances" of the individual taxpayer but that such circumstances "do not include the maintenance of an affluent or luxurious standard of living"). "The burden of making that showing falls on the spouse requesting relief." *Sleeth v. Commissioner*, 991 F.3d 1201, 1206 (11th Cir. 2021), *aff'g* T.C. Memo. 2019-138. A hypothetical hardship is insufficient to justify relief; a taxpayer must demonstrate that imposing joint and several liability is inequitable in present terms and poses a present economic hardship. *Pullins v. Commissioner*, 136 T.C. 432, 446 (2011). We evaluate the taxpayer's financial circumstances as of the time of trial. *Id.* at 446–47.

On brief, Dr. Strom appears either to misunderstand the nature of the economic hardship inquiry or to be advancing a straw man argument. First, he repeatedly overstates the amount of the underlying tax liability at issue in these cases (more than doubling it to $83 million in some instances and $84 million in others) by including the alleged amount of interest that has accrued on the deficiency that the Stroms now concede is due from them for 2000. Then, using that figure, he argues that, "[w]hile one could debate the Stroms' exact net worth at the time of trial, there can be no reasonable argument that it is nowhere

**[\*62]** close to $83 million," and thus that "their assets would be wiped out to pay the tax liability."

It may be the case that the Stroms do not have the means to pay the entire tax liability. However, that is not the proper inquiry. Rather, the question before the Court is whether, after paying his reasonable living expenses, Dr. Strom can pay any portion of the joint tax liability for 2000. *See Haggerty v. Commissioner*, 505 F. App'x at 338 ("There is nothing to suggest [the requesting spouse] could not at least make periodic monthly payments to decrease her tax liability."); *Sleeth*, T.C. Memo. 2019-138, at \*11 (finding that, where the requesting spouse had equity in her townhouse, she "could make at least some partial payment on the liabilities" despite having minimal income that would otherwise support an economic hardship finding); *Johnson v. Commissioner*, T.C. Memo. 2014-240, at \*15–16 ("There is no economic hardship where, although the taxpayer is unable to pay the liability all at once, she is able to meet her reasonable basic living expenses while making periodic payments.").

At the time of trial Dr. Strom remained married to, and continued to reside with, Mrs. Strom, who at that time earned an annual salary of $240,000. She also served on the board of directors of Benchmark Electronics. Moreover, Dr. Strom concedes on brief that at the time of trial the Stroms' had a net worth of at least $13,432,098. This includes the Kirkland condominium in which the Stroms concede they had $3.2 million in equity.

As we have previously noted in cases involving taxpayers with ample means that place them well above the federal poverty guidelines that govern the economic hardship analysis, *see* Rev. Proc. 2013-34, § 4.03(2)(b), Dr. Strom's "situation is totally dissimilar from other requesting spouses, who were living at or near poverty level at the time of their request and who proved that they would suffer economic hardship without relief from joint and several liability," *see Feldman v. Commissioner*, T.C. Memo. 2003-201, slip op. at 11–12, *aff'd*, 152 F. App'x 622 (9th Cir. 2005); *see also Knorr v. Commissioner*, T.C. Memo. 2004-212, slip op. at 22. Indeed, in view of the significant assets that the Stroms held at the time of trial, it is clear that, after paying reasonable basic living expenses, Dr. Strom can make at least some partial payment on the tax liability for 2000. We therefore find that Dr. Strom will not suffer economic hardship if relief is not granted. *See Alt*, 119 T.C. at 314–15, 315 n.8 (finding that the requesting spouse would not experience economic hardship if relief were denied where the couple

[*63] was still married and their combined annual income was over $150,000). Accordingly, this factor is neutral.

### 5. *Knowledge of the Understatement*

If, in cases involving an understatement, the requesting spouse did not know and had no reason to know of the item giving rise to the understatement as of the date the joint return was filed, this factor will weigh in favor of relief. Rev. Proc. 2013-34, § 4.03(c)(i)(A), 2013-43 I.R.B. at 401. If, however, in such cases the requesting spouse knew or had reason to know of the item giving rise to the understatement as of the date the joint return was filed, this factor will weigh against relief. *Id.*

We have concluded herein for purposes of section 6015(b)(1)(C) that Dr. Strom had actual knowledge of the item giving rise to the understatement on the Stroms' 2000 return. Dr. Strom has not alleged that Mrs. Strom abused him or that she restricted his access to financial information in any way. *See* Rev. Proc. 2013-34, § 4.03(c)(i)(A) (stating that, where the nonrequesting spouse abuses the requesting spouse or restricts the requesting spouse's access to financial information, this factor will weigh in favor of relief even if the requesting spouse knew or had reason to know of the understatement). Accordingly, this factor weighs against relief.

### 6. *Legal Obligation*

This factor is relevant when either the requesting or the nonrequesting spouse has a legal obligation to pay the outstanding tax liability pursuant to a divorce degree or other legally binding agreement. Rev. Proc. 2013-34, § 4.03(2)(d), 2013-43 I.R.B. at 402. Dr. and Mrs. Strom are still married and there is no evidence of any legal obligation requiring one or the other to pay the tax liability. Accordingly, this factor is neutral.

### 7. *Compliance with Income Tax Laws*

If the requesting spouse remains married to the nonrequesting spouse and continues to file joint returns with the nonrequesting spouse after requesting relief, then this factor will be neutral if the joint returns are in compliance with the tax laws but will weigh against relief if they are not. Rev. Proc. 2013-34, § 4.03(2)(f)(ii), 2013-43 I.R.B. at 402. There is no dispute that the joint returns filed by the Stroms for the taxable years after 2000 have been in compliance with the tax laws. Accordingly, this factor is neutral.

**[\*64]**        8.        *Mental or Physical Health Problems*

This factor will weigh in favor of relief if the requesting spouse "was in poor physical or mental health" at the time the return to which the request for relief relates was filed or at the time he requested relief. *See* Rev. Proc. 2013-34, § 4.03(2)(g), 2013-43 I.R.B. at 403; *see also Pullins*, 136 T.C. at 454. Relevant considerations include "the nature, extent, and duration of the condition, including the ongoing economic impact of the illness." Rev. Proc. 2013-34, § 4.03(2)(g). If the requesting spouse was not in poor mental or physical health, this factor is neutral. *See id.* "The question is not whether the requesting spouse was ill but whether an illness 'impacted the \* \* \* [the spouse's] ability to meet her Federal tax obligations.'" *Sutherland v. Commissioner*, T.C. Memo. 2021-110, at \*19 (alteration in original) (quoting *Banderas v. Commissioner*, T.C. Memo. 2007-129, slip op. at 29).

Dr. Strom asserts that he "is dealing with the results of lymphedema, including the loss of his thumb, limited use of his arm, and persistent swelling and pain." He further asserts that "[h]is prosthetic heart valve has limited his physical activity, and his long existing drug addiction is being treated by a psychotherapist and by regularly attending Alcoholic[s] Anonymous meetings." Additionally, Dr. Strom asserts that at the time the return was filed, he was suffering from drug addition, anxiety, depression, and cognitive difficulties.

On brief, the only evidentiary items in the record Dr. Strom cited in support of the foregoing claims are his self-serving testimony and that of Mrs. Strom,[68] and his physical demonstration at trial that one of his thumbs has been removed. Dr. Strom has offered no corroborating medical documentation. Where, as here, the requesting spouse asserts claims of poor mental or physical health but fails to proffer any corroborating medical documentation we have found this factor to be neutral. *See Wang*, T.C. Memo. 2014-206, at \*43 (finding health factor neutral where requesting spouse proffered no "supporting evidence whatsoever that she suffered from any mental or physical health

---

[68] At trial, Mrs. Strom conceded that she too stood to gain personally if Dr. Strom were accorded innocent spouse relief. In this respect, we note that "the Tax Court, like any other trial court, has no obligation to credit the uncontradicted testimony of interested parties." *Deihl v. Commissioner*, 603 F. App'x 527, 528–29 (9th Cir. 2015) ("A taxpayer's entitlement to innocent spouse relief 'often turns on credibility, which is best tested in the crucible of trial . . . .'" (quoting *Wilson v. Commissioner*, 705 F.3d 980, 993 (9th Cir. 2013), *aff'g* T.C. Memo. 2010-134)), *aff'g* T.C. Memo. 2012-176.

**[\*65]** problems" and proffered "only her own self-serving and uncorroborated statements"); *Bland v. Commissioner*, T.C. Memo. 2011-8, slip op. at 13 (finding health factor neutral where requesting spouse testified to being diabetic, taking seven medications a day, and seeing a doctor every two weeks, but proffered no supporting evidence to substantiate or corroborate her testimony); *Banderas v. Commissioner*, T.C. Memo. 2007-129, slip op. at 29–30 (finding health factor neutral where requesting spouse made generalized assertions of poor health but the record was "bereft of any corroborating medical documentation or any specific contentions regarding how such ailments might have impacted . . . [her] ability to meet her Federal income tax obligations"); *see also Durland v. Commissioner*, T.C. Memo. 2016-133, at \*101 (noting that while requesting spouse "testified that she was in poor mental health and attended counseling during the years at issue, . . . [she] never introduced any credible evidence to corroborate her claims").

Furthermore, Dr. Strom has made contradictory claims regarding his mental and physical health. In his First Form 8857 filed in 2009, Dr. Strom marked the box indicating "No" in response to the question of whether he had a mental or physical health problem at the time he signed the 2000 return. But, in his Second Form 8857 filed in 2012, he marked the box indicating "Yes" in response to the same question. Whatever the reason for this contradiction,[69] in view of the foregoing we conclude that Dr. Strom has not carried his burden to prove that he "was in poor mental or physical health" within the meaning of the revenue procedure during the relevant periods. *See Haggerty v. Commissioner*, 505 F. App'x at 341 (concluding that requesting spouse failed to carry her burden to prove that she was in poor mental health where, inter alia, she did not indicate in the Form 8857 that she had any health problems at that time or at the time she signed the return and did not introduce any evidence of mental illness or mental health treatment); *see also Sutherland*, T.C. Memo. 2021-110, at \*18–20 (concluding that requesting spouse had "not shown that an alleged health condition affected her ability to comply with the tax laws" where, inter alia, she did not indicate in the Form 8857 that she had any health problems at

---

[69] At trial, Dr. Strom testified that he initially checked the box "No" in 2009 because at that time he was in denial concerning his drug addiction. We note that this explanation does not account for other significant contradictions between the two innocent spouse relief requests. For example, in the First Form 8857, Dr. Strom marked the box indicating "Yes" in response to the question of whether he reviewed the 2000 return before signing it. However, on the Second Form 8857, he marked the box indicating "No" in response to the same question.

**[\*66]** that time or at the time she signed the returns and did not present any medical evidence at trial); *Stennett-Bailey v. Commissioner*, T.C. Memo. 2011-205, slip op. at 15 (concluding that requesting spouse failed to carry her burden to prove that she was in poor mental or physical health where she did not indicate in the Form 8857 that she had any health problems at that time or at the time she signed the return, but then claimed on brief that "when she signed the return, she was suffering from a host of ailments, including severe headaches and mental stress"). Accordingly, this factor is neutral.

9. *Transferred Assets*

We have previously denied relief under section 6015(b)(1)(D) where the requesting spouse engaged in a transfer of assets motivated by a tax-avoidance purpose, namely, to shield the assets from federal tax liabilities by the use of section 6015. *See Ohrman v. Commissioner*, T.C. Memo. 2003-301, slip op. at 20–22 (denying relief where the requesting spouse and her husband executed a separation agreement resulting in the transfer of assets to her that had previously been held in her husband's name, and she remained in a marital relationship with him), *aff'd*, 157 F. App'x 997 (9th Cir. 2005); *Doyle*, T.C. Memo. 2003-96, slip op. at 15–16 (denying relief where the requesting spouse and her family "engaged in a systemic plan to put their assets beyond the reach of [the Commissioner's] legitimate collection activities"); *Pierce*, T.C. Memo. 2003-188, slip op. at 28–29 (denying relief where the requesting spouse engaged in transfers of property between herself and certain business entities, and "the ultimate object of these transactions was to shield assets from creditors, which ultimately included the Internal Revenue Service"). In denying such relief, we have noted that, when enacting section 6015, Congress expressed concern "that taxpayers not be allowed to abuse these rules . . . by transferring assets for the purpose of avoiding the payment of tax by the use of this election." *Pierce*, T.C. Memo. 2003-188, slip op. at 28 (quoting S. Rep. No. 105-174, at 55–56 (1998), *reprinted in* 1998-3 C.B. 537, 591–92).

As previously discussed, after the issuance of the notice of deficiency upon which these consolidated cases are based, the Stroms executed a Property Status Agreement, purporting to allocate certain interests in existing joint assets, including the Stroms' primary residence (i.e., the Kirkland condominium), to Dr. Strom as his sole and separate property. Dr. Strom argues that this transfer of the Kirkland condominium to him was "one piece of a comprehensive . . . [Property Status Agreement] and allocation of assets as separate or community

**[\*67]** whose purpose was to help preserve Bernee and Mark's marriage, to reflect their different contributions to their total net worth, and their different levels of risk tolerance and investment objectives." However, for the reasons that follow, we find that the principal purpose of the Property Status Agreement was tax avoidance, namely, to shield the assets therein allocated to Dr. Strom—in particular, the Kirkland condominium—from the Stroms' 2000 federal tax liability by the use of section 6015.

a. *Connection Between the Stroms' 2000 Federal Tax Liability and the Property Status Agreement*

First, the preparation and execution of the Property Status Agreement coincided with several critical events in the dispute over the Stroms' 2000 federal tax liability.[70] For example, the billing records of Mr. Baker, the attorney Dr. Strom retained in connection with the Property Status Agreement matter, indicate that Mr. Baker commenced that matter by conducting a teleconference with Mr. Hallett on March 9, 2009. This fact is significant because at that time Mr. Hallett was representing the Stroms in their refund suit in the U.S. District Court for the Western District of Washington, and only three days earlier, on March 6, 2009, the Government had filed a Notice of Appeal, therein appealing the District Court's holding that Mrs. Strom was entitled to defer to a significant extent the calculation and recognition of income from her InfoSpace option exercises in 1999 and 2000.[71] Mr. Baker's billing records further indicate that the following week he conducted a teleconference with Dr. Strom on March 17, 2009; a teleconference with Mr. Hallett, on March 18, 2009; and additional teleconferences with both Dr. Strom and Mr. Hallett on March 19, 2009. On March 23, 2009, Dr. Strom and Mr. Baker conducted their first in-person meeting.

---

[70] Generalized references in this section to "the dispute over the 2000 federal tax liability" apply to the Stroms' refund suit, these cases, or both, as applicable, but we note that this phrase is used only for purposes of discussing the basis for our conclusion that the principal purpose of the Property Status Agreement was tax avoidance. We are aware of course that, in the refund suit, the Stroms also sought refund of income and Medicare taxes previously paid for the 1999 taxable year.

[71] Among other things, Dr. Strom argues that the Property Status Agreement was "carried out for reasons unrelated to tax liabilities" because "at the time Baker was engaged, the Stroms had substantially prevailed in the district court on the key issue that would determine the amount of the 2000 tax deficiency." In view of the timing of the filing of the Notice of Appeal and Dr. Strom's retention of Mr. Baker, we are not persuaded by this argument.

**[\*68]** If the purpose of the Property Status Agreement was unrelated to the dispute over the Stroms' 2000 tax liability, we must accept that this initial flurry of activity in the immediate wake of the filing of the Notice of Appeal and the repeated involvement of Mr. Hallett were mere coincidences. At trial, Mr. Baker testified that, with respect to his retention by Dr. Strom, Mr. Hallett "mentioned to me that he had a client and he referred the client to me for estate planning, and there wasn't necessarily a property status agreement."[72] Even if Mr. Baker's initial three teleconferences with Mr. Hallett could be explained as relating to Mr. Hallett's being the source of the referral, Mr. Baker's billing records show that he conducted two additional teleconferences with Mr. Hallett on June 3 and June 16, 2009.

There is more than circumstantial evidence of the connection between Mr. Baker's work on the Property Status Agreement and Dr. Strom's innocent spouse claim. Mr. Baker was provided a copy of Dr. Strom's initial innocent spouse relief request and his billing records reveal that he spent time "[r]eview[ing] emails re innocent spouse, etc." and "[r]eview[ing] innocent spouse implications of agreement."

The temporal connection between the work on the Property Status Agreement and developments in the dispute over the Stroms' 2000 federal tax liability continued after Mr. Baker's initial engagement. Dr. Strom emailed Mr. Baker on June 28, 2010, four days after the Ninth Circuit issued a Notice of Oral Argument in the Stroms' refund suit. The text of Dr. Strom's email, which bears the subject line, "let's get it signed," carries a surprising urgency in view of the fact that at that time there had been next to no activity in the Property Status Agreement matter since a teleconference held on April 20, 2010,[73] involving Dr. Strom, Mrs. Strom, and Ms. Brenner, and moreover, no activity (before the aforementioned teleconference) since Mr. Baker had provided copies of the revised draft Property Status Agreement to Dr. Strom and Ms. McClaran for review on January 19, 2010. The email stated:

---

[72] In addition to referring Dr. Strom to Mr. Baker, on April 6, 2009, Mr. Hallett referred Mrs. Strom to Pamela McClaran, the attorney retained by Mrs. Strom in connection with the Property Status Agreement matter.

[73] The only activity reflected in Mr. Baker's records between that teleconference on April 20, 2010, and Dr. Strom's above-referenced email is an indication that Mr. Baker spent .20 hours reviewing the status of the matter on May 10, 2010.

**[\*69]** Bernee and I would like to get our post nupt and supportive documents signed ASAP, finally. If there are any modifications we can deal with that later. Please advise regarding how we can make that happen. We can come down to your office as soon as is practicable in order to get things wrapped up. Please get back to me as soon as you can. Thanks.

In response, on June 29, 2010, Mr. Baker sent two emails stating, inter alia, that, following the teleconference held on April 20, 2010, it was his understanding that the Stroms had been contemplating "a complete overhaul" of the draft Property Status Agreement that Mr. Baker had sent to Dr. Strom and Ms. McClaran on January 19, 2010 (which had divided the Kirkland condominium equally), and that, as a result of this "overhaul," the entire Kirkland condominium would be allocated entirely to Dr. Strom based on the issuance of an additional one million shares of Ensequence stock to Mrs. Strom, "the value of which would allow us to move the condo to Mark [i.e., Dr. Strom]." In response to a question from Mr. Baker as to whether those additional Ensequence shares had been issued, Dr. Strom wrote that "Bernee did not receive the additional 1 million shares" but that he nevertheless thought "we should try to stretch her equity as far as we can push it now, get the agreement signed the way things are now, and then we can make changes later if necessary." Tellingly, in our view, Dr. Strom then added: "If we wait any longer the clock will catch up with us. . . . [W]e probably cannot afford that." On the basis of the timing and content of these email exchanges, we believe that Dr. Strom's sense of urgency is most plausibly explained by the impending oral argument and a desire to have an executed agreement in place before it was to occur (on August 5, 2010). Mr. Baker's contemporaneous meeting notes from a teleconference that he held with Dr. and Mrs. Strom on July 24, 2010, reference "oral arguments," indicating that the parties discussed the topic at that time. And in fact the Property Status Agreement was executed before the oral argument on August 5, 2010, with Dr. and Mrs. Strom signing on July 26, 2010, and Mr. Baker signing on July 27, 2010.

Any lingering doubt whether the Property Status Agreement matter and the dispute over the Stroms' 2000 federal tax liability were connected is eliminated by the events following the issuance of the Ninth Circuit's opinion on April 6, 2011, reversing the District Court's holding as to Mrs. Strom's entitlement to the deferral of gains realized from the exercise of InfoSpace stock options. On April 12, 2011, less than a week later, Dr. Strom emailed Mr. Baker in full: "Lost!! Pull out the

[*70] documents. Ugh." On April 13, 2011, Mr. Baker responded in full: "Ugh is an understatement! I am so sorry to hear this news. Yes, I will organize the documents." At trial, Mr. Baker confirmed that the "documents" to which he was referring included the Property Status Agreement. That one of Dr. Strom's reactions to learning of the Ninth Circuit's reversal was to contact Mr. Baker and instruct him to "pull out the documents," is compelling evidence that both Dr. Strom and Mr. Baker understood that, beneath any pretext,[74] the principal purpose of the Property Status Agreement was to shield certain assets, in particular the Kirkland condominium, from the Stroms' 2000 federal tax liability.

Furthermore, we note that Mr. Baker's billing records indicate that, following the subsequent denial of the Stroms' petition for rehearing by the Ninth Circuit on June 7, 2011, and the issuance of its mandate on June 15, 2011, Mr. Baker conducted an in-person conference with Mr. Hallett on June 22, 2011. At that time, there had been no activity in the Property Status Agreement matter since November 18, 2010, when Mr. Baker had contacted Ms. McClaran and sent the Property Status Agreement to her for signature. Ms. McClaran executed the Property Status Agreement on November 22, 2010, raising the question why, if the Property Status Agreement matter was unrelated to the dispute over the Stroms' 2000 tax liability, Mr. Baker felt it appropriate to bill Dr. Strom for an in-person conference with Mr. Hallett in connection with that matter seven months later.

b.    *Valuation and Representation*

Second, any notion that Dr. and Mrs. Strom were "attempt[ing] to accomplish a division of the community investments that they in good faith believed was approximately equal in net value," as Dr. Strom argues, is belied by the fact that the Property Status Agreement—on its

---

[74] With respect to the issue of pretext, we note that in an email sent to Dr. Strom on June 29, 2010, Mr. Baker expressed concern that if the Stroms went forward with the "complete overhaul" of the previous arrangement (which had allocated the Kirkland condominium equally) to an arrangement allocating the Kirkland condominium entirely to Dr. Strom, as the Stroms were at that time contemplating, "we would have to consider how we might deal with the history of correspondence that Pamela [McClaran] and I crafted to show the rationale for the arrangement previously proposed (which divided the condo equally between you and Bernee because there was not sufficient value in her column to totally allocate the condo to you.)" At trial Mr. Baker conceded that this email indicated he was aware at that time that there was not enough value on Mrs. Strom's side of the ledger to allocate the Kirkland condominium entirely to Dr. Strom.

**[\*71]** face—overstated by $2 million the total value of the assets allocated to Mrs. Strom.  Moreover, this so-called math error was not corrected until almost four years later with the execution of an Amendment of Property Status Agreement.[75]

Besides the parties' extended disregard of a $2 million error in the value attributed to Mrs. Strom's separate property in the agreement, the lack of rigor in the assignment of value to the allocated properties further belies the claim that the Property Status Agreement was a good faith effort to divide community property.  The parties waived formal appraisals of the affected properties; Mr. Baker consulted Zillow and local property tax assessments in assigning a value to the Kirkland condominium and accepted the values given him by the Stroms' employee, Ms. Brenner, for other properties without any independent verification.  The agreement recites "that the valuations of assets and liabilities in the exhibits are approximate only."  Coupled with the fact that Mrs. Strom's independent counsel, Ms. McClaran, who had been retained to represent her interests in the agreement negotiations, was essentially excluded from discussions once the determination was made to allocate the Kirkland condominium entirely to Dr. Strom rather than equally, the parties' entirely casual approach to valuing assets with a total value exceeding $11 million supports a finding, which we make, that the Property Status Agreement was not a good faith attempt to divide community property.

c.    *Kirkland Condominium*

The January 2010 draft of the Property Status Agreement—that is, the last draft to involve Ms. McClaran's input—had allocated the Kirkland condominium equally between Dr. and Mrs. Strom.  However, the record establishes that, once Ms. McClaran was excluded from the deliberations over the terms of the Property Status Agreement, the Stroms' primary focus with respect to the agreement became finding a justification to allocate the entire interest in the Kirkland condominium to Dr. Strom.

This push began with the teleconference on April 20, 2010, between Mr. Baker, Dr. Strom, Mrs. Strom, and Ms. Brenner.  The initial justification for allocating the Kirkland condominium entirely to Dr. Strom, discussed at that teleconference, turned on an expectation

---

[75] The Amendment of Property Status Agreement, which was executed by Dr. and Mrs. Strom on April 3, 2014, refers to the $2 million overstatement as a "math error."

[*72] that Mrs. Strom would be issued an additional one million shares of Ensequence stock. When those shares did not materialize, Dr. Strom then suggested in an email sent on June 29, 2010, that Mr. Baker "stretch . . . [Mrs. Strom's] equity as far as we can push it," which Mr. Baker understood to have meant finding "some [value-related] figures" to allocate to Mrs. Strom's side of the column that in turn "would justify an allocation to the—of the house to Mark's side of the column." Mr. Baker thereafter responded to Dr. Strom on the same date to "agree about stretching the equity" but also asked whether Mrs. Strom or Ms. Brenner could "give . . . [him] more support . . . involving the new business or otherwise." After Dr. Strom did not respond, Mr. Baker made a second request on July 2, 2010, again asking whether Mrs. Strom or Ms. Brenner could "give . . . [him] some ammunition to add value in Bernee's column for the new ventures—and increase . . . [Dr. Strom's] share of the condo accordingly."

On July 5, 2010, Dr. Strom responded to Mr. Baker by email to apologize "that . . . [he] had to ask . . . [them] for numbers several times" and to advise that "Bernee and Karen [Brenner] ran through some figures and there most definitely are numbers which will swing Bernee's share over the critical point." He further advised that Ms. Brenner would be sending Mr. Baker an email with those figures.

On July 6, 2010, Ms. Brenner sent an email to Dr. Strom and Mr. Baker stating in relevant part:

> Bernee is still in negotiation with Ensequence but given the status, she assured [sic] of receiving additional value for her Board representation for the past 8 years, which up to now has not been compensated. This recognition is being offered by the major funding source out of his personal holdings in the company and is an allocation of his proceeds to her. We ran an analysis of the current deal offered to Bernee and believe, depending upon the ultimate sales of the company as provided by the company that it is currently worth between $640,000 and $1.28 million. We believe Bernee will realize a better arrangement than that currently offered but given what is on the table, I believe you can safely assume some value which will substantiate the position that both Mark and Bernee have agreed to re: the allocation of their assets.

**[\*73]** On July 9, 2010, Mr. Baker sent an email to Dr. and Mrs. Strom, attaching, inter alia, a revised copy of the Property Status Agreement.[76] In the email, he described several changes that he had made "in order to make the numbers work":

> You will see that I have juggled assets and liabilities in the PSA. I have not stated the condo debt as a liability in B's column, but it is implied given her obligation to pay ½ of the debt in lieu of rent while she occupies the condo. I have also eliminated the deferred tax liabilities of . . . Mark's retirement plans in order to make the numbers work. Let me know what you think. I will noodle over what changes if any need to be made in the correspondence trail that I have with Pamela. I think I can avoid making any such changes by a new letter introducing the new Ensequence stock and the plan to shift the condo to M.

These two emails are significant for several reasons. First, Ms. Brenner's email shows that the value attributed to additional Ensequence stock allocated to Mrs. Strom's side of the ledger was entirely speculative; by Ms. Brenner's own admission, it was based on a deal that was "still in negotiation," and moreover, her analysis of the value that she attributed to it incorporated further assumptions such as "depending upon the ultimate sales value of the company as provided by the company." Second, Mr. Baker's email shows that the lengths to which he went in "making the numbers work" did not stop with attributing speculative values to the assets allocated to Mrs. Strom, but in fact extended to wholly removing liabilities that had previously been listed in the asset schedules attached to the January 2010 draft. Third, as with his email sent to Dr. Strom on June 29, 2010, Mr. Baker's email expresses concern about his previous history of correspondence with Ms. McClaran and how to reconcile it with a new arrangement allocating the entire Kirkland condominium to Dr. Strom. We believe that Mr. Baker's repeated references to his correspondence with Ms. McClaran are indicative of an attempt, in view of the dispute over the Stroms' 2000 federal tax liability, to craft a pretext for the Property Status Agreement and of an awareness of its true tax avoidance purpose.

---

[76] Mr. Baker would subsequently explain to Dr. Strom, in an email sent on March 11, 2014, that the "math error" resulting in a $2 million overstatement of the total value of the assets allocated to Mrs. Strom arose in this draft of the Property Status Agreement, which "moved the condo asset and liability (via Mingus) to your column and awarded the anticipated additional Ensequence shares to Bernee."

**[\*74]**           d.     *Transferred Assets Conclusion*

In view of the foregoing, and on the basis of all of the facts and circumstances, we find that the principal purpose of the Property Status Agreement was to shield the assets therein allocated to Dr. Strom—in particular, the Kirkland condominium—from the Stroms' 2000 federal tax liability by the use of section 6015. "It is elementary, of course, that one seeking equity must do equity." *Doyle*, T.C. Memo. 2003-96, slip op. at 16. Accordingly, this factor weighs against relief.

10.     *Section 6015(b)(1)(D) Conclusion*

Of the factors considered above, five are neutral, and four weigh against relief. No factor weighs in favor of relief. However, our decision whether relief is appropriate is not based on a simple tally of factors. In balancing the equities here, we find that the factors weighing against relief cut decisively against the granting of such relief. Thus, taking into account all of the facts and circumstances, and on the basis of the entire record, we hold that under section 6015(b)(1)(D) it is not inequitable to hold Dr. Strom liable for the deficiency attributable to the understatement on the Stroms' 2000 return.

II.     *Relief Under Section 6015(f)*

Section 6015(f) provides for equitable relief from joint and several liability if, (1) taking into account all the facts and circumstances, it is inequitable to hold the taxpayer liable for any unpaid tax or any deficiency (or any portion of either) and (2) relief is not available to the requesting spouse under subsection (b) or (c).

We have held herein that Dr. Strom does not qualify for relief under section 6015(b). He is ineligible for relief under section 6015(c) because he is still married to and living with Mrs. Strom. *See* § 6015(c)(3)(A).

However, we have also held herein, on the basis of all of the facts and circumstances, that under section 6015(b)(1)(D) it is not inequitable to hold Dr. Strom liable for the deficiency attributable to the understatement on the Stroms' 2000 return. The equitable factors we consider under section 6015(b)(1)(D) are the same equitable factors we consider under section 6015(f). *Alt*, 119 T.C. at 316; *Wang*, T.C. Memo. 2014-206, at \*25; *Garavaglia v. Commissioner*, T.C. Memo. 2011-228, slip op. at 79–80, *aff'd*, 521 F. App'x 476 (6th Cir. 2013); *Olson v. Commissioner*, T.C. Memo. 2009-294, slip op. at 16–17; *Johnson v.*

**[\*75]** *Commissioner*, T.C. Memo. 2009-156, slip op. at 16–17; *Becherer*, T.C. Memo. 2004-282, slip op. at 9–10; *Rosenthal v. Commissioner*, T.C. Memo. 2004-89, slip op. at 24 n.11; *Bartak*, T.C. Memo. 2004-83, slip op. at 28; *Doyle*, T.C. Memo. 2003-96, slip op. at 16.  Accordingly, we hold that under section 6015(f) it is not inequitable to hold Dr. Strom liable for the deficiency attributable to the understatement on the Stroms' 2000 return and that, consequently, he is not entitled to relief under section 6015(f).

To reflect the foregoing and the concessions of the parties,

*Decisions will be entered for respondent.*